

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-21-2000

# Gruenke v. Seip

Precedential or Non-Precedential:

Docket 98-2041

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Gruenke v. Seip" (2000). *2000 Decisions.* Paper 171.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/171

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 21, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-2041

JOAN GRUENKE, Individually and as
parent and natural guardian of
Leah Gruenke, a minor,

      Appellant

v.

MICHAEL SEIP

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 97-cv-05454)
District Judge: Honorable Franklin S. VanAntwerpen

Argued September 9, 1999

Before: ROTH and WEIS, Circuit Judges
SHADUR,[1] District Judge

(Opinion filed August 21, 2000)

Richard J. Orloski, Esquire (Argued)
Orloski, Hinga & Pandaleon
111 North Cedar Crest Boulevard
Allentown, PA 18104

 Attorney for Appellant

_____

1. Honorable Milton I. Shadur, United States District Court Judge for the
Northern District of Illinois, sitting by designation.

Richard A. Polachek, Esquire
  (Argued)
Polachek, Pecile & Smith
320 South Pennsylvania Boulevard
Suite 394
Wilkes-Barre, PA 18701

  Attorney for Appellee

OPINION OF THE COURT

ROTH, Circuit Judge

Emmaus High School swim team coach, Michael Seip, suspected that team member, Leah Gruenke, was pregnant. Despite Leah's repeated denials of pregnancy, Seip allegedly required Leah to take a pregnancy test. Leah and her mother, Joan, have now sued Seip under 42 U.S.C.S 1983, claiming that the pregnancy test, and the actions surrounding it, constituted an illegal search in violation of Leah's Fourth Amendment rights, unconstitutionally interfered with Joan and Leah's right to familial privacy, violated Leah's right to privacy regarding personal matters, and violated Leah's right to free speech and association protected by the First Amendment. In their suit, Joan and Leah also made claims under Pennsylvania tort law.

The District Court granted summary judgment in favor of Seip on the S 1983 claims on the basis of qualified immunity and dismissed the Gruenkes' state law claims without prejudice.

For the reasons stated below, we affirm the District Court's grant of summary judgment with respect to the "familial right to privacy" and the free speech and association claims. We reverse and remand, however, with respect to the Fourth Amendment and "privacy regarding personal matters" claims. Because that reversal restores the case to the District Court's docket, we reverse and remand its dismissal of the Pennsylvania state tort claims.

2

I.

A.

Seventeen year-old Leah Gruenke was an eleventh grader
at Emmaus High School and a member of the varsity swim
team. In January of 1997, Michael Seip, the varsity swim
coach, began to suspect that Leah was pregnant. At swim
practice, Seip observed that Leah was often nauseated,
made frequent trips to the bathroom, and complained
about having a low energy level. In addition, Leah's body
was "changing rapidly." In February of 1997, Seip asked his
assistant swim coach, Kim Kryzan, who also had observed
the changes in Leah's behavior and physical appearance, to
approach Leah to discuss the possibility that Leah was
pregnant. Although the exact content of this discussion is
not clear, Leah refused to volunteer any information; she
denied that she was pregnant and refused to acknowledge
she had had sex with her boyfriend. Shortly after the
discussion between Leah and Kim Kryzan, Seip approached
Leah and attempted to discuss sex and pregnancy with her.
When questioned by Seip, Leah again emphatically denied
that she was pregnant.

Meanwhile, other members of the swim team began to
suspect that Leah was pregnant. Leah, however, denied the
possibility, claiming that she had never had sexual
intercourse. Leah refused to acknowledge that she might be
pregnant because she felt that her condition was nobody's
business.

Leah was also approached by a school guidance
counselor, at Seip's request, and by the school nurse. Both
the guidance counselor and the nurse attempted to discuss
with Leah the possibility of pregnancy, but Leah again
denied the possibility, refusing to volunteer any
information.

During this time, the mothers of other swim team
members also began to suspect Leah's possible pregnancy
and discussed this hunch with Seip. At least one of the
mothers suggested that Leah should take a pregnancy test.
Eventually, Lynn Williams, a mother of a swim team
member, purchased a pregnancy test and gave it to Seip.

3

He reimbursed Williams for the test and kept it at the school.

On March 5, 1997, Leah was approached by two fellow swim team members, Abby Hochella and Kathy Ritter, who suggested that Leah take a pregnancy test to clear her name. Leah refused, stating that she would not take a test unless everyone on the team took a test. The next day, Leah was again approached by Hochella and Ritter. At this point, there is some conflict in the stories. Leah alleges that Ritter and Hochella told her that they still had the pregnancy test kit, given to them by Seip, and that Seip wanted her (Leah) to take the test. Ritter and Hochella, however, recount a different version, claiming that they merely told Leah that Seip had a pregnancy test if Leah wanted to take it. Similarly, Seip contends that he did not encourage Leah to take the test nor did he try to get Hochella and Ritter to persuade Leah to take a pregnancy test. He acknowledges, however, telling Hochella and Ritter that if Leah were his friend, he would ask her to take a pregnancy test.

Following this second attempt to convince Leah to take a pregnancy test, Leah wrote a letter to Seip (which he apparently never read) stating that Seip had no right to make her take a pregnancy test, that she was not showing any symptoms of being pregnant, and that she had never had sexual intercourse. According to Leah, she also told Ritter and Hochella, in an attempt to get them to stop bothering her, that she could not be pregnant because she had never had sexual intercourse.

That same day, despite rejecting their earlier attempts, Leah was again approached by Ritter and Hochella. According to Leah, Ritter and Hochella claimed that unless Leah took the pregnancy test, Seip would take her off the relay team. Hochella, however, contends that she and Ritter tried to convince Leah to take the test by suggesting that a negative test result would resolve speculation about her condition. Ritter and Hochella further contend that Leah ultimately approached them and volunteered to take the pregnancy test.

Ritter, Hochella, and another member of the swim team, Sara Cierski, were all present when Leah finally took the

4

first pregnancy test. The test was positive. Cierski suggested that Leah take another test. Cierski, Ritter, and Hochella then went to the school parking lot where they got money from their parents to purchase two additional pregnancy tests. Leah drove with Hochella and Ritter to purchase the pregnancy test kits. Leah took both tests; both were negative.

Later that night, Leah recounted the events of the day to her mother, who was very upset. Hochella called Leah that evening and suggested that Leah take another pregnancy test. Hochella also told Leah that Hochella's mother would be willing to take Leah to the doctor to determine with certainty whether Leah was pregnant. Leah got up early the next morning and went to school where she took a fourth pregnancy test, purchased this time by Hochella and her mother. Ritter and Hochella were with Leah in the school locker room when she took the test. Again, the test was negative.

After learning of the positive test result, Seip asked assistant swim coach Dr. Meade, an orthopedist, whether in his medical opinion it was acceptable for a pregnant swimmer to compete on the team. Dr. Meade advised Seip that swimming would not endanger Leah's pregnancy. Based on this advice, Seip decided that there was no medical reason to prevent Leah from competing on the team. The District Court found that beyond consulting a school guidance counselor and his assistant coaches, Seip did not attempt to talk directly to Leah's parents or to inform a higher level of the school's administration that Leah was pregnant. The District Court further found that Leah continued to deny the possibility that she was pregnant until she was examined by Dr. Greybush, on March 10, 1997, at an appointment scheduled by her mother. There, Leah ultimately learned that she was almost six months pregnant. Even then, Leah did not reveal to anyone else on the swim team or at school that she was pregnant because she wanted to compete in the state swim tournament. Eventually, however, Leah's teammates, their parents, and Leah's mother learned that Leah was indeed pregnant.

5

The Gruenkes allege that after Leah's baby was born, Seip tried to alienate Leah from her peers. Specifically, Leah testified that after she quit the private swim team that Seip also coached, Seip told members of his team not to sit with Leah during swim meets. Moreover, Leah asserts that during her last year of high school, Seip refused to speak to her and retaliated against her by taking her out of several swim meets.

B.

On August 26, 1997, Joan Gruenke, for herself and on her daughter's behalf, filed suit under 42 U.S.C.S 1983 and state tort law, 42 Pa. Cons. Stat. S 8550, et. seq., in U.S. District Court for the Eastern District of Pennsylvania. The Gruenkes allege that their rights under the Constitution and Pennsylvania state tort law were violated when Seip required Leah to take a pregnancy test.

The Gruenkes subsequently amended their complaint on November 4, 1997, alleging that the required pregnancy test (1) constituted an illegal search in violation of Leah's Fourth Amendment rights, (2) violated Joan and Leah's right to familial privacy, (3) violated Leah's right to privacy regarding personal matters, (4) violated Leah's right to free speech and association protected by the First Amendment, and (5) violated Joan and Leah's rights under state tort law.

On September 4, 1998, Seip moved for summary judgment claiming qualified immunity. The District Court granted Seip's motion for summary judgment on the Gruenkes' S 1983 claims, holding that Seip was entitled to qualified immunity either because he had not violated any clearly established constitutional rights, or alternatively, that the Gruenkes' claims did not give rise to the violation of a constitutional right, clearly established or otherwise. See Gruenke v. Seip, 1998 WL 734700, at *8-*15 (E.D. Pa. October 21, 1998). In so holding, the District Court did not reach the merits of Leah's various constitutional claims. The District Court then dismissed the state tort law claims for lack of subject matter jurisdiction. On November 9, 1998, the Gruenkes appealed the District Court's decision.

II.

The District Court had subject matter jurisdiction over the Gruenkes' S 1983 claims pursuant to 28 U.S.C. S 1331, and over their state tort law claims under 28 U.S.C.S 1367. We have appellate jurisdiction over the Gruenkes' claims under 28 U.S.C. S 1291. Our review of the District Court's disposition of a S 1983 case on summary judgment alleging qualified immunity is plenary:

> [We] review the district court's summary judgment determination de novo, applying the same standard as the district court. . . . [I]n all cases[,] summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial[,] and the moving party is entitled to judgment as a matter of law.

Kornegay v. Cottingham, 120 F.3d 392, 395 (3d Cir. 1997) (quoting Spain v. Gallegos, 26 F.3d 439, 446 (3d Cir. 1994)).

III.

Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. This section does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right. See Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979) ("[S]ection[1983] is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that [section 1983] describes."). To state a claim under S 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law, deprived her of a federal constitutional or statutory right. See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir. 1997) (citing Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds, Daniels v. Williams, 474 U.S. 327 (1986)).

7

In a typical S 1983 action, a court must initially determine whether the plaintiff has even alleged the deprivation of a right that either federal law or the Constitution protects. See Baker, 443 U.S. at 140 ("The first inquiry in any S 1983 suit . . . is whether the plaintiff has been deprived of a right `secured by the Constitution and laws.' "). As the Supreme Court recently emphasized, when the defendant in a S 1983 action claims qualified immunity, our first task is to assess whether the plaintiff 's allegations are sufficient to establish the violation of a constitutional or statutory right at all. See, e.g., Conn v. Gabbert, 526 U.S. 286, 290 (1999); County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).

If the plaintiff 's allegations meet this threshold, we must next determine whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known. If so, then the defendant is not entitled to qualified immunity. If, in contrast, the plaintiff 's allegations fail to satisfy either inquiry, then the defendant is entitled to summary judgment. Until the question of qualified immunity is addressed, a court cannot reach the underlying merits of the case. See Harlow v. Fitzgerald, 457 U.S. 800, 813-20 (1982); see also Siegert v. Gilley, 500 U.S. 226, 232 (1991) ("One of the purposes of immunity, qualified or absolute, is to spare a defendant not only unwarranted liability but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) ("The entitlement is an immunity from suit rather than a mere defense to liability . . . and . . . is effectively lost if a case is erroneously permitted to go to trial.").

In the seminal qualified immunity case, Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court articulated the oft-quoted legal standard for analyzing a qualified immunity defense: "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. In analyzing a claim for qualified

8

immunity, then, a court must deny the claim if the law is clearly established, "since a reasonably competent public official should know the law governing his conduct" unless he can either demonstrate extraordinary circumstances or that he "neither knew nor should have known" about the legal right in question. Id. at 818-19.

Anderson v. Creighton, 483 U.S. 635 (1987), clarified the Harlow standard in two key ways that bear on our analysis of Seip's claim for qualified immunity. First, Anderson held that, whether a government official asserting qualified immunity could be held personally liable for conduct that allegedly violated a constitutional or statutory violate depended on the "objective legal reasonableness" of the action. Id. at 639. Under this standard, government officials are shielded from civil liability not based on their subjective understanding of the law but only "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Id. Second, Anderson defined more specifically the meaning of a "clearly established right":

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 639. In sum, an official will not be liable for allegedly unlawful conduct so long as his actions are objectively reasonable under current federal law. See Malley v. Briggs, 475 U.S. 335, 341 (1986) (observing that "all but the plainly incompetent or those who knowingly violate the law" are protected by qualified immunity).

The evaluation of a qualified immunity defense is appropriate for summary judgment because the court's inquiry is primarily legal: whether the legal norms the defendant's conduct allegedly violated were clearly established. See Mitchell, 472 U.S. at 528. Nevertheless, some factual allegations, such as how the defendant acted, are necessary to resolve the immunity question. See id. We

have phrased the inquiry for granting qualified immunity in terms of the defendant's conduct:

> [I]t is not sufficient that the right at issue be clearly established as a general matter. Rather, the question is whether a reasonable public official would know that his or her specific conduct violated clearly established rights.

Grant v. City of Pittsburgh, 98 F.3d 116, 121 (3d Cir. 1996) (citing Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990)). We also noted in Grant that this admittedly fact-intensive analysis must be conducted by viewing the facts alleged in the light most favorable to the plaintiff. See Grant, 98 F.3d at 122 (discussing inquiry on appeal of denial of qualified immunity). Finally, when qualified immunity is denied, any genuine disputes over the material facts are remanded, to be settled at trial.

With this framework in mind, we will analyze each of the Gruenkes' claims in turn.

A. Fourth Amendment

The Gruenkes argue that the pregnancy test taken by Leah that was allegedly administered by or at the behest of Seip constituted an illegal search under the Fourth Amendment. As the District Court correctly noted, a school official's administration of a pregnancy test to a student "clearly constitutes a search within the meaning of the Fourth Amendment." Gruenke, 1998 WL 734700, at *7. It foundered, however, on whether her right to be free from this type of search was clearly established.

Although the District Court analyzed Leah's claim within the proper legal framework governing Fourth Amendment searches of athletes in public schools, see id. , it misapplied the qualified immunity framework to her claim when it failed to heed Anderson's caveat that the specific official conduct need not have been previously deemed unlawful. Instead, the District Court reasoned that, because the question of whether the administration by a school official of a pregnancy test to a student was one of first impression, Leah's right to be free from the search was not clearly established:

10

> We decline to decide today whether a Fourth
> Amendment violation may be established by the facts
> in this case. We merely wish to indicate that as in
> Anderson II, we cannot say that the right allegedly
> violated has been clearly established by prior law.
> Anderson v. Creighton, 483 U.S. 635, 639-40 (1987).
> Taking the Plaintiffs' assertions as true for the
> purposes of this motion, we certainly do believe the
> Defendant's conduct was questionable and wonder why
> he failed to discreetly refer any concerns about Leah
> Gruenke directly to her parents or to higher levels of
> the school administration. Indeed, without the qualified
> immunity issue, we might well find that material issues
> of fact exist as to whether the Defendant violated
> Plaintiffs' fourth amendment rights. However, as a
> matter of law, we cannot say that the law on this issue
> has been clearly established, and therefore must hold
> that the Defendant is entitled to qualified immunity on
> this fourth amendment claim.

Id. at *8. This conclusion is wrong. Merely because the
Supreme Court has not yet ruled on whether a school
official's administration of a pregnancy test to a student
violates her Fourth Amendment rights does not mean the
right is not clearly established. Moreover, a review of
current Fourth Amendment law in the public school context
reveals not only that the right is clearly established, but
also that Seip's conduct as alleged was objectively
unreasonable.

We turn first to the question of whether Leah's right to
refuse to submit to the pregnancy test was clearly
established. The Fourth Amendment of the Constitution
protects individuals from unreasonable searches and
seizures by the government, see U.S. Const., Amend. IV,
and this prohibition against unreasonable governmental
intrusions extends to state public school officials as well.
See New Jersey v. T.L.O., 469 U.S. 325, 336-37 (1985).
Whether a search is unconstitutional depends on its
reasonableness. Although probable cause is the common
touchstone for reasonableness in criminal contexts, in
other circumstances, there may be "special needs" that
make probable cause impracticable. See id. at 341
(requiring individualized suspicion).

11

The public school context is one of those settings. Thus, reasonableness is determined by balancing the government's interest against the individual's expectation of privacy. In the public school context, students have a reduced expectation of privacy when compared with the public at large. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656–57 (1995) (holding randomly testing student athletes for drugs satisfies Fourth Amendment). Student athletes, because they not only submit to "suiting up" in communal locker rooms, but also frequently agree to follow certain regulations, such as taking physical exams and acquiring insurance, have an even lower expectation of privacy than their fellow students who do not play sports. See id. at 657.

The nature of the intrusion must also be considered when determining whether the search is unreasonable. A urinalysis test, like the one conducted for drugs in Vernonia, is clearly intrusive because it reveals personal information but can be made less so by having students take it in private, tailoring it so that it tests only for drugs, and limiting the disclosure of the information it reveals. See id. at 658. Finally, the government's interest in the search must be balanced against the intrusion. This interest must be compelling, one that is "important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." Id. at 660.

We believe that the standard set forth in Vernonia clearly establishes that a school official's alleged administration to a student athlete of the pregnancy tests would constitute an unreasonable search under the Fourth Amendment. Although student athletes have a very limited expectation of privacy, a school cannot compel a student to take a pregnancy test absent a legitimate health concern about a possible pregnancy and the exercise of some discretion. This is not to say that a student, athlete or not, cannot be required to take a pregnancy test. There may be unusual instances where a school nurse or another appropriate school official has legitimate concerns about the health of the student or her unborn child. An official cannot, however, require a student to submit to this intrusion

12

merely to satisfy his curiosity. While it might be shown at trial that the facts are more favorable to Seip, we cannot say, as a matter of law, that his conduct as alleged by the Gruenkes did not violate a clearly established constitutional right.

Nor do we consider Seip's alleged conduct to have been reasonable under this standard. The requirement that an official's conduct be objectively reasonable casts a wide net of protection to most officials but it does not insulate all official conduct. See Harlow, 457 U.S. at 819 ("[Qualified immunity . . . provide[s] no license to unlawful conduct."). When the defendant violates a clearly established right about which a reasonable person would have known, he is not entitled to qualified immunity. See, e.g., Parkhurst v. Trapp, 77 F.3d 707, 712–13 (3d Cir. 1996); Simmons v. City of Philadelphia, 947 F.2d 1042, 1088–89 (3d Cir. 1991). Even if the right is clearly established, officials will not be held liable if they were "acting reasonably in good-faith fulfillment of their responsibilities." Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir. 1985); see also Hynson v. City of Chester, 827 F.2d 932, 933 (3d Cir. 1987) (same). Public school officials have the same guarantee. Qualified immunity "must be such that public school officials understand that action taken . . . within the bounds of reason under all circumstances will not be punished and [those officials] need not exercise their discretion with timidity." Wood v. Strickland, 420 U.S. 308, 321 (1975) (emphasis added).

However, under current precedent, we cannot say that Seip's conduct passes this objective test. Here, the swim coach, an individual without any medical background, allegedly forced Leah to take a pregnancy test. His responsibilities can be reasonably construed to include activities related to teaching and training. They cannot be extended to requiring a pregnancy test. Moreover, a reasonable swim coach would recognize that his student swimmer's condition was not suitable for public speculation. He would have exercised some discretion in how he handled the problem. Seip, however, has offered no explanation that could justify his failure to respect the boundaries of reasonableness.

13

We hold, therefore, that Seip is not entitled to qualified immunity from Leah's Fourth Amendment, S 1983 claim, because Seip should have reasonably known that his conduct would violate a clearly established right. For this reason, we reverse the District Court's grant of summary judgment with respect to Leah's Fourth Amendment claim and remand this claim to the District Court.2

B. Substantive Due Process

1. Right to Privacy

The Gruenkes next argue that Seip violated Leah's substantive due process right to privacy. In evaluating the Gruenkes' claim, the District Court analyzed two lines of relevant Supreme Court cases: (1) cases implicating an individual's interest in independence when making certain decisions; and (2) cases implicating an individual's interest in avoiding disclosure of personal matters. See Gruenke, 1998 WL 734700, at *11. The District Court first decided that the Gruenkes' claim did not fall under thefirst line of cases, because Leah's decision-making with respect to a fundamental right had not been impaired. See id.

With respect to Leah's other substantive due process claim, the right to keep certain personal matters private, however, the District Court acknowledged that "[t]he Third Circuit has clearly recognized that private medical information is `well within the ambit of materials entitled to privacy protection' " under the substantive due process clause. Id. (citing United States v. Westinghouse Electric Corp., 638 F.2d 570, 577 (3d Cir. 1980)). The District Court concluded, however, that because the Third Circuit"ha[d] not yet addressed the compelled disclosure by a school official of a student's health records," the right to be free from such disclosure was not a clearly established one. Gruenke, 1998 WL 734700, at *12. In arriving at this

_____

2. In so holding, we leave for another day the question of whether, under facts otherwise analogous to those presented today, an appropriate school official would be entitled to qualified immunity for requiring a pregnancy test under Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646 (1995).

14

outcome, the District Court reasoned that, although the "[p]laintiffs [sic] claim does . . . fall under the right to be free from disclosure of personal matters, . . . .[w]ithout any cases where some factual correspondence exists with the present case, . . . this court must conclude that there is no relevant clearly established law and that the Defendant is entitled to qualified immunity." Id.

As it did in analyzing Leah's Fourth Amendment claim, the District Court misconstrued the test for determining whether an allegedly violated right is clearly established. As we stated above, the test is not whether the current precedents protect the specific right alleged but whether the contours of current law put a reasonable defendant on notice that his conduct would infringe on the plaintiff 's asserted right. See Anderson, 483 U.S. at 639. Leah's claim not only falls squarely within the contours of the recognized right of one to be free from disclosure of personal matters, see Whalen v. Roe, 429 U.S. 589, 599-600 (1977), but also concerns medical information, which we have previously held is entitled to this very protection. See Westinghouse Electric Corp., 638 F.2d at 577. While the preservation of this right must be balanced with factors such as concerns for public health in the work environments, see Doe v. Southeastern Pa. Transp. Auth., 72 F.3d 1133, 1139 (3d Cir. 1995), Leah's version of the facts satisfies this test. While it may prove, at trial, that her facts misstate the case, that possibility does not entitle Seip to qualified immunity at the summary judgment stage.

We are also concerned by the District Court's assertion that "[e]ven considering the facts in a light most favorable to the Plaintiffs, it is . . . highly uncertain  that Leah Gruenke's test information was in fact confidential or that its disclosure was compelled by the Defendant." Id. (emphasis added). The District Court's characterization as "highly uncertain" of the likelihood that Leah's test information was confidential or that its disclosure was compelled by Seip belies its grant of summary judgment. If, as Leah alleges, the information about her pregnancy tests was confidential,3 and Seip compelled Leah to take the

_____

3. As the District Court noted, it is at best unclear whether Leah's pregnancy was actually "confidential"; her condition may have been readily observable to the public because of her physical appearance. See Gruenke, 1998 WL 734700, at *12.

tests, his alleged failure to take appropriate steps to keep that information confidential, by Seip's having Leah's teammates administer the test and by his discussing the test results with his assistant coaches, could infringe Leah's right to privacy under the substantive due process clause. This type of conduct is not objectively reasonable under current law and does not entitle Seip to immunity from suit. Moreover, Leah's testimony creates genuine issues of material fact, which make the District Court's grant of summary judgment inappropriate. We therefore reverse the District Court's grant of summary judgment with respect to Leah's right to privacy claim and remand this claim to the District Court.

2. Right to Familial Integrity4

The Gruenkes also argue that Seip violated their substantive due process right to be free from state interference with family relations. While acknowledging that "the Supreme Court has clearly recognized a fundamental liberty interest in familial integrity and privacy," the District Court held that the Gruenkes' claim that Seip violated Leah's right to familial privacy and Joan's right to influence and guide her daughter during her pregnancy did not rise to the level of a constitutional violation, or, even if it did, the constitutional right in question was not clearly established. Gruenke, 1998 WL 734700, at *11. As such, the District Court granted Seip's motion for summary judgment, concluding that the Gruenkes' failure to establish the violation of a clearly established constitutional right on either basis meant that Seip was entitled to qualified immunity. Although we ultimately agree that Seip is entitled to qualified immunity, we disagree with the District Court's reasoning.

The right of parents to raise their children without undue state interference is well established. As the Supreme Court remarked in M.L.B. v. S.L.J., 519 U.S. 102 (1996), "[c]hoices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as of basic importance in our society, rights sheltered by the

_____

4. Part III.B.2 represents the views of Judges Weis and Shadur only. Judge Roth's views are set forth in a separate concurring opinion.

16

Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." Id. at 116 (citation and internal quotes omitted).

In Santosky v. Kramer, 455 U.S. 745 (1982), the Court pointed out that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . ." Id. at 753. Indeed, it is " `plain beyond the need for multiple citation' that a natural parent's `desire for and right to the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right." Id. at 758-59 (quoting Lassiter v. Department of Soc. Servs., 452 U.S. 18, 27 (1981)) (some internal quotes omitted).

In Troxel v. Granville, No. 99-138, 2000 WL 712807 (U.S. June 5, 2000), the Court reiterated that the parental interest in "the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court." Id. at *5. That case reaffirmed the validity of such long-standing precedents as Meyer v. Nebraska, 262 U.S. 390, 401 (1923) (right of parents to control education of their children), Pierce v. Society of Sisters, 268 U.S. 510, 534-35 (1925) (right to direct upbringing and education of children), and Prince v. Massachusetts, 321 U.S. 158, 166 (1944), where the Court said "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." See also Wisconsin v. Yoder, 406 U.S. 205, 232-33 (1972) ("primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition," particularly in matters of "moral standards, religious beliefs, and elements of good citizenship").

Notwithstanding these near-absolutist pronouncements, the Court has also recognized that for some portions of the day, children are in the compulsory custody of state-operated school systems. In that setting, the state's power is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." Vernonia Sch. Dist. v. Acton , 515 U.S. 646, 655

17

(1995). For some purposes, then, "school authorities act[ ] in loco parentis." Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 684 (1986). But see New Jersey v. T.L.O., 469 U.S. 325, 336–37 (1985) (school authorities are not merely parental surrogates but also exercise public authority for Fourth Amendment purposes.).

Thus, there may be circumstances in which school authorities, in order to maintain order and a proper educational atmosphere in the exercise of police power, may impose standards of conduct on students that differ from those approved by some parents. See, e.g. , Vernonia, 515 U.S. at 664–65 (allowing participation in school athletics to be conditioned upon testing for illegal drugs); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988) (permitting censorship of school–sponsored publication); T.L.O., 469 U.S. at 347–48 (upholding warrantless search of student's effects).

Although a student may not enjoy a right of privacy to the same extent as a free adult, there are nevertheless limitations on intrusions by school authorities. Thus, in Vernonia, although the Court approved drug tests, it was also careful to indicate that the tests were inappropriate to determine "whether the student is, for example, epileptic, pregnant, or diabetic." 515 U.S. at 658. In describing the justification for the random, coerced drug testing in Vernonia, the Court pointed out that the State must demonstrate "an interest that appears important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." Id. at 661.

It is not unforeseeable, therefore, that a school's policies might come into conflict with the fundamental right of parents to raise and nurture their child. But when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest.

As the Court said in Roberts v. United States Jaycees, 468 U.S. 609 (1984), "[t]he Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of

18

certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." Id. at 618. Familial relationships are the quintessential "personal bonds" that "act as critical buffers between the individual and the power of the State." Id. at 619–20.

In determining whether plaintiffs have presented a constitutional issue that will survive summary judgment, the reviewing court draws all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party. Sameric Corp. v. City of Phila. , 142 F.3d 582, 590 (3d Cir. 1998). In this case, review is complicated because in critical instances, the facts and inferences are sharply contested and the testimony on some points is quite vague. We are, however, persuaded that there is sufficient evidence, coupled with such reasonable inferences, to establish an unconstitutional interference with familial relations.

Defendant Seip conceded that he could not exclude Leah from the team or bar her from participating in swim meets merely because she was pregnant. He was aware that some women compete in such strenuous activities as triathlons in the seventh month of pregnancy. He was, of course, free to limit her participation because of poor performance, but did not until the state meet on March 15, 1997.

In December 1996, Leah's father commented to Seip that Leah's racing times had increased. Seip said that she appeared to be heavier in the water. Even though he had suspicions, he made no comment to Leah's father about possible pregnancy at that time or in the following month in a subsequent discussion.

In January 1997, the parents arranged for Leah to have a medical examination because of her decreased stamina and slower racing times. A physician diagnosed a vitamin deficiency and prescribed dietary supplements. Her examination did not reveal the pregnancy, although no pregnancy test was administered. The physician said that additional tests would be required to definitively rule it out. Leah declined the additional tests because, based on her previous health history, her symptoms did not indicate pregnancy.

19

Leah and her mother discussed the possibility of pregnancy at that time, but took no further steps then. Mrs. Gruenke also discussed Leah's condition with a nurse friend, who also suggested a vitamin deficiency. The parents testified that Leah was a very athletic person and her appearance did not suggest pregnancy, at least not until the end of March.

The record does not disclose whether Seip was aware that Leah had a medical examination in January 1997, but by the following month, he had engaged in discussions of Leah's possible pregnancy with some of her teammates, their mothers, assistant coaches and a guidance counselor. He also had an assistant coach attempt to determine whether Leah might admit to pregnancy. In addition, Seip had a conversation with Leah about sexual conduct that could lead to pregnancy.

Despite his suspicions of Leah's pregnancy, Seip did not contact Mrs. Gruenke because "she would hang up on him." He apparently did not consider sending a note circumspectly outlining the symptoms he had observed, and he failed to mention his suspicions to her father when asked about changes in her performance.

Seip did nothing to stop the gossip; rather, he added credence to it when he would, on occasion, tell others that it was possible that Leah was pregnant. The continuing discussions with a number of persons developed for some weeks until the affair culminated in Leah's submission, under pressure, to a pregnancy test. She said that she had agreed to the test as a result of threats to bar her from swimming in the state championship meet taking place in less than ten days. Seip did not make these statements to her directly, but through her teammates. He also furnished the pregnancy test kit, which he had previously acquired and had kept at the school.

Leah took the test while several teammates waited nearby. One of them informed Seip that the result was positive. Other tests performed that evening and the following morning were negative. The news of the initial results, however, spread rapidly through the high school community. One of the girls told the putative father, among

20

others. Leah told her mother about the readings and she immediately made an appointment with a physician, who confirmed that Leah was pregnant.

As the parents explained, had not all the adverse publicity occurred as the result of Seip's actions, they would have quietly withdrawn Leah from school, apparently after the state meet, and sent her to Florida to live with her married sister. After the child was born, it might have been adopted by the sister or another sibling, but because Seip's conduct made the family's dilemma a topic of conversation for the school community, any discreet measures that the parents would have taken were no longer feasible.

Mrs. Gruenke alleges, therefore, that Seip's continued intrusion into what was a private family matter, his failure to notify her while instead aiding and abetting the members of the team and their mothers in making Leah's pregnancy a subject of gossip in the school community, violated her constitutional right to manage the upbringing of her child. Mrs. Gruenke's position is that the management of this teenage pregnancy was a family crisis in which the State, through Seip, had no right to obstruct the parental right to choose the proper method of resolution. As is apparent, Leah's claim of deprivation of privacy, which has been remanded for trial, overlaps with and is largely inseparable from that of familial rights.

In reviewing the record, one is struck by the fact that the guidance counselor, aware of the situation, apparently did not advise Seip to notify the parents. Nor did the counselor herself undertake that responsibility. Even the principal (himself a former guidance counselor), who did not became aware of the matter until late in the game, did not even comment that this was a matter for the parents and not school authorities. His reprimand to Seip did not mention the supremacy of the parents' interest in matters of this nature.

This case presents another example of the arrogation of the parental role by a school similar to, although not as egregious as, Arnold v. Board of Education, 880 F.2d 305 (11th Cir. 1989). In that case, the parents alleged that school officials coerced a student into having an abortion

21

and urged her not to discuss the matter with her parents. The Court held that in so acting, the school counselor interfered with the parents' right to direct the rearing of their child. Id. at 312.

The Arnold Court declined to hold that counselors are constitutionally mandated to notify parents when their minor child receives counseling about pregnancy, but nevertheless indicated, "[a]s a matter of common sense," counselors should encourage communication. Id. at 314. In this case, however, Seip was not a counselor whose guidance was sought by a student, but instead, someone who was acting contrary to her express wishes that he mind his own business.

We need not consider the potential liability of school counselors here, although we have considerable doubt about their right to withhold information of this nature from the parents. Because public school officials are state actors, they must not lose sight of the fact that their professional association ethical codes, as well as state statutes, must yield to the Constitution.5

School-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution. See Merriken v. Cressman, 364 F. Supp. 913, 922 (E.D. Pa. 1973) (questionnaire probing family relationships by school authorities held unconstitutional). Public schools must not forget that "in loco parentis" does not mean "displace parents."

It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights.

_____

5. See Stephen R. Ripps et al., To Disclose or Not to Disclose: The Dilemma of the School Counselor, 13 MISS. C. L. REV. 323, 328-29 (1993) ("[T]here is a developing trend in state and federal case law recognizing the existence of a legal duty or special relationship between the school district and a student's parents necessitating disclosure of personal information about the student in certain circumstances.").

State deference to parental control over children is underscored by the Court's admonitions that "[t]he child is not the mere creature of the State," Pierce , 268 U.S. at 535, and that it is the parents' responsibility to inculcate "moral standards, religious beliefs, and elements of good citizenship." Yoder, 406 U.S. at 233.

Although the parents have sufficiently alleged a constitutional violation,6 the record must establish that the right violated was clearly established in order to defeat Seip's claim of immunity. At this point, the plaintiffs' claim falters. Although the general principles were articulated by the Supreme Court opinions, their application to the unique circumstances of this case cannot be said to have been clearly established. We conclude that on that basis, Seip is entitled to qualified immunity and judgment in his favor on the familial claim. See Sameric Corp. v. City of Phila., 142 F.3d 582, 590 n.6 (3d Cir. 1998).

C. First Amendment

Finally, the Gruenkes argue that Seip violated Leah's First Amendment rights by forbidding members of his private swim team from associating with Leah. Holding that the Gruenkes had failed to show that Seip had violated Leah's First Amendment rights, and therefore had failed to show any violation under S 1983, the District Court also granted Seip qualified immunity on this fourth claim. See Gruenke, 1998 WL 734700 at *13. Characterizing Leah's asserted right to associate with her former team members as purely social, the District Court analogized this right to the other types of social associations that the Supreme Court has previously denied constitutional protection. See id. ("[T]he activity of talking to swim team members during a swimming competition is not an individual liberty interest protected by the First Amendment.")

We agree with the District Court's reasoning, although we will modify its outcome. While the Constitution also guards those associational activities necessary to further other

_____

6. Any such violation does not, however, extend to the allegations of interference in the relationship between Leah and her unborn child.

activities, such as speech and assembly, that the First Amendment directly protects, purely social rights to association lack this same heightened constitutional protection. See, e.g., City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989) (denying constitutional protection to young adults' asserted right to socialize in public settings). Seip's alleged interference with Leah's interaction with other swimmers clearly does not amount to a violation of a protected right.7 We will thus affirm the District Court's grant of summary judgment in favor of Seip. See Sameric Corp., 142 F.3d at 590 n.6.

D. Related State Tort Law Claims

The Gruenkes' state law tort claims were before the District Court pursuant to 28 U.S.C. S 1367. Because the District Court dismissed the Gruenkes' S 1983 claims on summary judgment, the court also dismissed the Gruenkes' supplemental state tort law claims noting that "the absence of any federal question or constitutional issue" made dismissal of the state tort law claims appropriate. Gruenke, 1998 WL 734700 at *14. Because we reverse the District Court's grant of summary judgment with respect to the Gruenkes' Fourth Amendment and right to privacy claims, thus restoring the case to active status, we will also reverse and remand the District Court's dismissal of the Gruenkes' state tort law claims.

IV.

In conclusion, we hold that the District Court erred in granting Seip's motion for summary judgment with respect to Leah's Fourth Amendment claim and Leah's right to privacy claim, and we reverse and remand these claims for further consideration consistent with this opinion. We affirm the District Court's grant of summary judgment with respect to the Gruenkes' right to familial integrity claim and

_____

7. We also agree with the District Court's conclusion that Leah's asserted right to social association does not fall within the ambit of the right to education that Brown v. Board of Education, 347 U.S. 483 (1954), protects.

24

Leah's First Amendment claim because Seip is entitled to qualified immunity with respect to these claims. We also reverse the order dismissing the Gruenkes' supplemental state law tort claims and remand them to the District Court.

ROTH, Circuit Judge, concurring in part:

I write separately on the issue of interference with familial relations. While I concur with the majority's ruling that Seip is entitled to summary judgment on the claim for interference with familial relations, I disagree that the Gruenkes have alleged such a constitutional violation.

The factual basis for the Gruenkes' claim of interference with family relations lies in their claims that Seip destroyed Joan Gruenke's right to raise and advise Leah, her daughter, without outside influences of the public, Appellants' Opening Br. at 47, and that he destroyed Leah's right as a child and a potential parent to abort the fetus or carry it to term. See id. at 49. They assert that Seip disclosed the results of the pregnancy test to Leah's classmates and to Seip's assistant coaches but not to Leah's parents or to the higher school administrators. See id. at 51. The Gruenkes qualify their claims by acknowledging that while Seip "did not personally coerce Leah to make any decision regarding her pregnancy,[he] did set in motion a chain of events that prevented[the Gruenkes] from making childbirth and reproductive decisions autonomously." Id. at 51–52. While it is unfortunate that, as a result of Seip's actions, the Gruenkes may have had certain personal family matters disclosed in an unwanted manner, I do not believe that this subsequent disclosure violated a constitutional right.

I reach this conclusion because the type of interference that the Gruenkes assert does not fall within the scope of actions that constitutionally infringe on familial privacy. In evaluating the Gruenkes' claims of an unconstitutional interference with parents' fundamental right to make decisions concerning the care, custody, and control of children, I will turn first to Troxel v. Granville, 120 S.Ct. 2154 (2000), the most recent Supreme Court case dealing with this issue.1 In Troxel , a plurality of the Court found

_____

1. We note, however, that, to the extent Troxel expanded the boundaries of parental rights, it cannot for qualified immunity purposes apply to Seip's past actions since, as a case decided this Term, it could not, by definition, retroactively govern his actions in 1997. See Harlow, 457 U.S. at 818 (noting that law must be clearly established at "the time an action occurred.")

that a Washington statute, providing for the rights of visitation with minor children, violated the substantive due process rights of the mother because of its "breathtaking" scope: Any person could petition at any time for visitation of a child with the only requirement being that the visitation serve the best interest of the child. Id. at 2061. A parent's decision that visitation would not be in the child's best interest was given no deference; the best interest determination was placed solely in the hands of the judge. See id. In writing for the plurality, Justice O'Connor stated that "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." Id. (emphasis added) (citing Reno v. Flores , 507 U.S. 292, 304 (1992)).

This reasoning in Troxel is consistent with the Court's earlier decisions defining the scope of the liberty interest of parents to control the upbringing of their children without interference from the state. These cases, upon which Troxel relies, involve the injection of the state into the process of raising children. For example, in two of these cases, the Court declared unconstitutional laws that impeded parents' decisions on their children's education by prohibiting private schools, see Pierce v. Society of Sisters, 268 U.S. 510 (1925), or the teaching of foreign languages in schools, see Meyer v. Nebraska, 262 U.S. 390 (1923).

In a third one, Santosky v. Kramer, 455 U.S. 745 (1982), the Court held that, to terminate parental rights, a state must present clear and convincing evidence of unfitness. In yet another, M.L.B. v. S.L.J., 519 U.S. 102 (1996), the Court held that a right to appeal in forma pauperis  must be granted by the state when parental rights are terminated. Finally, in Quilloin v. Walcott, 434 U.S. 246 (1978), the Court rejected the efforts of the father of an illegitimate child to veto the adoption of that child by the natural mother's husband. Instead, it concluded that a natural father who had failed to claim paternity until the adoption was proposed could not rely on state law to overturn the state's full recognition of an already existing family unit

27

that was in the child's best interests. See id.  at 255-56. Each of these cases share a common theme: They involve a situation in which the state has attempted by statute or by a court's procedural requirements to eliminate a parent's role in the custody or nurture of the child.

The situation before in this case is very different. The Commonwealth of Pennsylvania has not attempted by statute or by court proceedings to determine the outcome of Leah's pregnancy or to dictate whether she should keep the child or give it up for adoption. Nor did Seip physically prevent Leah or her parents from taking any action as a consequence of her pregnancy. The claim here is that Seip's discussion of Leah's pregnancy with others and his failure to inform the Gruenkes of the pregnancy merely complicated the Gruenkes' ability to make decisions concerning the pregnancy. This alleged breach of privacy and failure by a school official to impart information to the family is not an action by the state to control the education of a child against the parents' wishes or to determine custody or visitation without proper input by the parents. In fact, the Gruenkes were free at all times to make whatever decision they pleased as to the outcome of Leah's pregnancy, even after Seip discussed her condition with other parents or swim team members.

Accepting the facts as proffered by the Gruenkes, I conclude that the Gruenkes have failed to establish the violation of a constitutional right to familial integrity. Consequently, Seip is entitled to summary judgment on this claim, see Sameric Corp., 142 F.3d at 590 n.6, but, I believe, not for the reasons cited by the majority.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

28