TRAXLER, Circuit Judge,
concurring in part and dissenting in part:
I concur in parts I, II, III(C), and IV of the majority opinion, and I agree with the result reached in part 111(A). I write separately to explain my differing analysis with regard to the issues addressed in parts 111(A), 111(B), and V of the majority opinion.
I.
The Tripps rely on three different legal theories in claiming that the district court erred in granting summary judgment against them on their Truth in Lending Act (“TILA”) cause of action, see 15 U.S.C.A. § 1601, et seq. I agree with the majority that the Tripps’ claim CFAW did not make known the TILA disclosures were estimates failed as a matter of law. I will address the Tripps’ other TILA theories seriatim.
A.
The Tripps first argue that the district court erred in concluding they had not created a genuine factual issue concerning whether CFAW violated TILA by waiting until after the credit contract was signed to give them a copy of the document containing the TILA disclosures. I agree.
In enacting TILA, Congress declared that “[i]t is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the un *633 informed use of credit.” 15 U.S.C.A. § 1601(a) (West 1998). TILA specifically authorizes the Federal Reserve Board (“FRB”) to adopt regulations to carry out TILA’s purposes. See 15 U.S.C.A. § 1604(a) (West 1998).
The transaction at issue in this case was a closed-end credit transaction governed by 15 U.S.C.A. § 1638 (West 1998 & Supp. 2008) and “Regulation Z.” See 12 C.F.R. pt. 226, subpt. C (2008). With such transactions, the creditor is required to disclose, inter alia, the amount financed, the finance charge, the annual percentage rate, and the total sale price. See 15 U.S.C.A. § 1638(a); 12 C.F.R. § 226.18. These disclosures must be made before the transaction is consummated. See 15 U.S.C.A. § 1638(b); 12 C.F.R. § 226.17(b). The disclosures also must be made “clearly and conspicuously in writing, in a form that the consumer may keep.” 12 C.F.R. § 226.17(a)(1). Official Staff Commentary to the regulation clarifies the meaning of “form that the consumer may keep”:
The disclosure requirement is satisfied if the creditor gives a copy of the document containing the unexecuted credit contract and disclosures to the consumer to read and sign; and the consumer receives a copy to keep at the time the consumer becomes obligated. It is not sufficient for the creditor merely to show the consumer the document containing the disclosures before the consumer signs and becomes obligated. The consumer must be free to take possession of and review the document in its entirety before signing.
12 C.F.R. pt. 226, Official Staff Commentary 17(b)(3) (emphasis added). This rule that simply showing the disclosures to the consumer rather than allowing him to take possession of them furthers TILA’s purpose of allowing consumers “to compare more readily the various credit terms available.” 15 U.S.C.A. § 1601. If merely allowing a consumer to view the disclosures were sufficient and allowing the consumer to take possession of the disclosures were not required, consumers seeking to shop different creditors’ terms would need to memorize all of the figures as they proceeded from lender to lender.
Here, the Tripps stated in their affidavits and depositions that CFAW merely showed them the relevant documents but never gave them the documents until the documents were signed. According to the Tripps, they did not know CFAW would allow them to take a copy of its documents so that they could compare the terms offered to those offered by another lender. I therefore would hold that the Tripps created a genuine factual issue regarding whether CFAW’s disclosures satisfied TILA’s requirements.
CFAW argues it forecast evidence that had the Tripps decided to reject the terms disclosed on the credit contract, CFAW would have allowed them to walk away from the deal with a copy of the unsigned credit contract. In support of this claim, CFAW points to the following excerpt from the affidavit of Tim Doe, CFAW’s business manager:
If a CFAW customer decides to reject the credit terms disclosed on the Credit Contract or on a separate form, even after signing a Buyer’s Order, he or she may discontinue and cancel the entire transaction. In this situation, CFAW has no policy against a customer leaving the CFAW dealership with an unexecut-ed copy of the Credit Contract, which contains the credit terms mandated by [TILA]....
J.A. 391. CFAW’s argument notwithstanding, CFAW’s internal policy or secret intentions that were never communicated to the Tripps are not sufficient to discharge CFAW’s TILA obligations. Until CFAW gave the document to the Tripps, *634 or at least told them they could have it, the Tripps were certainly not “free to take possession of’ CFAWs document. The FRB’s Staff Commentary clearly provides that merely showing the disclosures to the consumer is not sufficient, and the Tripps forecast evidence that that was all CFAW did in this case.
B.
Despite my belief that the Tripps created a genuine factual issue regarding whether CFAW violated TILA by waiting until after the credit contract was signed to give them a copy of the TILA disclosures, in the end, I, like the majority, conclude that this liability theory fails as a matter of law. The district court concluded that, even if CFAW did not comply with Regulation Z’s form and timing requirements, the Tripps’ liability theory failed because (1) the Tripps failed to create a fact issue regarding whether they were actually injured from this alleged violation since they had no intention of shopping for better credit terms with other dealers, and (2) statutory damages were not available for the violation of untimely providing the required § 1638 disclosures. The Tripps do not challenge the first conclusion, but they do maintain that proof of a § 1638(b) violation would entitle them to statutory damages, and thus that failure to prove damages is not a basis on which summary judgment may be affirmed. However, for the reasons explained in Baker v. Sunny Chevrolet, Inc., 349 F.3d 862, 865-69 (6th Cir.2003), I agree with the district court that statutory damages are not allowed for a defendant’s untimely presentation of the required TILA disclosures, see also Brown v. Payday Check Advance, Inc., 202 F.3d 987, 990-92 (7th Cir.2000) (holding that statutory damages are available only for violations of subsections specifically enumerated in § 1640(a)), and I would affirm the grant of summary judgment regarding this theory on this basis.
II.
The Tripps next argue that the district court erred in determining they had not created a genuine issue of material fact regarding whether the $395 processing fee was required to be included in the “amount financed.” I agree.
TILA defines “finance charge,” as is relevant here, as “the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.” 15 U.S.C.A. § 1605(a) (West 1998). “The finance charge does not include charges of a type payable in a comparable cash transaction.” Id. In order to ensure that the finance charge disclosed to the consumer is the actual cost of obtaining credit, TILA prohibits a creditor from including a finance charge as an element of the “amount financed.” See 12 C.F.R. § 226.18 (requiring disclosure and itemization of, inter alia, the finance charge and the amount financed).
I believe that the Tripps created a genuine issue of material fact regarding whether, at the time they purchased their vehicle, CFAW was charging the $395 processing fee to every customer; and for that reason, I believe they also created a genuine issue of material fact regarding whether CFAW should have disclosed the $395 processing fee as part of the finance charge. Doe testified at a deposition in another case in April 1999 that “the services [CFAW provides in exchange] for the processing fee relate only to the title documents,” and that the fee is charged on every sale because CFAW needs to ensure that the lien is properly recorded on the title. J.A. 178. Doe explained that his endorsement of a check received from another lender “guarantees lien and title delivered to” that lender. J.A. 179. However, Doe also testified that if the custom *635 er paid cash — as opposed to borrowing money from CFAW or another lender— Doe “would give [the customer] the title documents,” let them do the title work, and not charge them the processing fee. J.A. 179. At that point in the deposition, CFAW’s lawyer requested a break and conferred with Doe. When the deposition continued, Doe testified that he had come to realize, after reviewing documents, that his prior testimony was a mistake and that in fact the processing fee was charged in every case.
In a deposition in the present case taken in May 2001, Doe reiterated that the $395 processing fee is charged regardless of how the customer paid for his car. And, the summary judgment record includes what CFAW contends is paperwork for the sales CFAW made for the months surrounding the Tripp transaction, which CFAW maintains shows that the processing fee was charged to every customer, even when there was no lien to be recorded. Nevertheless, I believe that a reasonable factfinder could credit Doe’s initial testimony that if the customer paid cash— as opposed to borrowing money from CFAW or another lender — Doe would not charge them the processing fee, and discredit Doe’s contrary testimony as being simply the result of CFAW’s counsel’s legal advice. Cf. Thorn v. Sundstrand, Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000) (explaining that when deponent changes his deposition testimony, it is for the jury to decide which testimony to believe); Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir.1997) (explaining that even when a deponent withdraws his previous deposition testimony, the withdrawn testimony remains part of the record).
If CFAW did not charge the processing fee in sales with no lien, then CFAW did not charge the fee in cash transactions that were comparable to the Tripps’ and the fee should have been included as part of the finance charge. Although CFAW could still maintain that it charged the fee in comparable transactions because it charged the fee to customers who borrow from outside lenders and pay with cashier’s checks, those transactions are not comparable to the Tripps’, in my view. In Doe’s April 1999 deposition, he testified that CFAW charges the processing fee to buyers paying with cashier’s checks from outside lenders because CFAWs endorsement of those checks acts as its guarantee that the lien will be properly recorded. Because no such guarantee was involved in the Tripps’ transaction, it cannot be said as a matter of law that these transactions were comparable to the Tripps’.
Relying on Alston v. Crown Auto, Inc., 224 F.3d 332 (4th Cir.2000) (per curiam), CFAW argues the transactions that did not involve a lien represented only a small minority of its sales, and it need not charge the fee in every transaction for it to be properly considered part of the amount financed rather than part of the finance charge. See Alston, 224 F.3d at 334 (holding that processing fee was not finance charge when general practice was to charge the fee regardless of whether customer paid with cash or credit). But, Alston is distinguishable from the present case in that the critical fact in Alston was that the seller’s general policy was to charge the fee to everyone; the two cash customers who did not pay the fee had individually negotiated for that arrangement. See id. If CFAW’s policy was not to charge the fee in no-lien sales, however, then the fee was not generally charged in comparable cash transactions, and it should have been included as part of the finance charge. I therefore would reverse the district court’s grant of summary judgment against the Tripps on this claim.
*636 III.
The district court, having granted summary judgment on all of the Tripps’ federal claims, declined to exercise supplemental jurisdiction over their state claims. See 28 U.S.C.A. § 1367(c)(3) (West 2006). Because I would reverse the grant of summary judgment on the TILA claim, I would also reverse the district court’s refusal to exercise supplemental jurisdiction on the state law claims. See Gruenke v. Seip, 225 F.3d 290, 308 (3d Cir.2000).
IV.
In sum, I would reverse the district court’s grant of summary judgment on the TILA claim that the $395 processing fee was required to be included in the “amount financed,” vacate the district court’s dismissal of the state law claims, and remand the TILA and state law claims to the district court for further proceedings. For the reasons expressed in Part I of my opinion and Parts III(C) and IV of the majority opinion, I would otherwise affirm the district court’s order granting summary judgment against the Tripps.