8 N.Y.3d 150 (2007)
863 N.E.2d 100
831 N.Y.S.2d 96
In the Matter of E.S., Respondent,
v.
P.D., Appellant.
Court of Appeals of the State of New York.
Argued January 3, 2007.
Decided February 15, 2007.
*151 William V. O'Leary, Albany, for appellant.
*152 Thomas K. Campagna, P.C., Ronkonkoma (Thomas K. Campagna of counsel), for respondent.
Robert D. Gallo, Sayville, and Judy Poznik, Law Guardians.
*153 Andrew Cuomo, Attorney General, Albany (Nancy A. Spiegel, Caitlin J. Halligan, Daniel Smirlock and Patrick J. Walsh of counsel), amicus curiae.
Chief Judge KAYE and Judges CIPARICK, GRAFFEO, SMITH and PIGOTT concur; Judge JONES taking no part.

OPINION OF THE COURT
READ, J.
We are asked to decide whether the grandparent in this case was properly granted visitation with her grandson pursuant to section 72 (1) of the Domestic Relations Law, and, if so, whether this provision is constitutional in view of the United States Supreme Court's decision in Troxel v Granville (530 US 57 [2000]). For the reasons that follow, we conclude that section 72 (1) was followed here, and is constitutional, both on its face and as applied.

I.
A.D. (mother) married P.D. (father) in 1992; their son C.D. was born in November 1993. In June 1997, A.D. was diagnosed *154 with cancer of the breast and spine. A.D.'s mother E.S. (grandmother), who lived in East Hampton, Long Island, was asked to move into the marital home in Huntington to care for her terminally ill daughter and the child. Grandmother cleaned the house, shopped, cooked household meals and looked after the child when A.D.'s illness prevented her from doing so.
After A.D.'s death in March 1998, father invited grandmother to stay on to help out with the then-four-year-old child's care and household duties. Grandmother agreed, and father, grandmother and the child lived together amicably in the Huntington home for the ensuing 3½ years. During that time, grandmother comforted, supported and cared for the motherless child. She got him ready for school, put him to bed, read with him, helped him with his homework, cooked his meals, laundered his clothes and drove him to school and to doctor's appointments and various activities, including gym class, karate class, bowling, soccer, Little League baseball and swimming class. She arranged and transported him to away-from-home or supervised at-home play dates; she took him to the public library and introduced him to the game of chess. From 1998 through 2001, the child and father spent entire summers at grandmother's home in East Hampton, where the child's maternal first cousins and other family members were frequently present as well.
By the fall of 2001, the relationship between grandmother and father had begun to sour. The reasons for this are disputed, but father and grandmother apparently differed over such matters as how to handle the child's sometime unwillingness to eat the food prepared for him at mealtime, and how strictly to enforce his bedtime, his tooth brushing regimen, homework routines and the like. In general, grandmother seems to have been more indulgent than father, who consequently came to view her as sabotaging his parental authority and competing with him for control over the household and, more importantly, the child. On February 24, 2002 father demanded that grandmother move out of the Huntington home immediately. Grandmother claims to have been completely surprised by this turn of events. She strenuously objected to leaving without at least saying goodbye to the child, who was away on a play date at the time, but she ultimately bowed to father's wishes and left with most of her belongings.
For the next seven or eight weeks, father forbade any contact between grandmother and the child. From April through *155 December 2002, father allowed sporadic visits, which were limited in length and tightly supervised, and occasional telephone calls. According to grandmother, an incident in December 2002, when she experienced a four-hour wait for a scheduled visit with the child, was the "last straw." She decided to seek judicial intervention, a decision that she characterizes as having been arrived at most reluctantly. Accordingly, in January 2003, grandmother, who was 78 years old at the time, commenced this proceeding pursuant to Domestic Relations Law § 72 and Family Court Act § 651 for an order granting reasonable visitation with the child, who was then nine years old. Father opposed grandmother's request, and cross-moved for an order prohibiting grandmother from any contact whatsoever with the child.
Supreme Court appointed a law guardian for the child and conducted a lengthy, multi-day hearing. Among the numerous witnesses who testified were grandmother, father, his mother and stepmother, and two of the child's former babysitters. Supreme Court also held an in camera interview with the child in the presence of the law guardian, and considered the law guardian's report and recommendation. On December 1, 2004, Supreme Court granted judgment to grandmother, and ordered visitation according to a detailed schedule. Supreme Court concluded that
"[a]lthough mindful of [father]'s right to rear [the child] as he sees fit, and of his stated concern that [grandmother] undermines his parental authority, the Court finds that he has failed to present any credible evidence warranting either the termination of the relationship between [grandmother] and [the child] or the imposition of restrictions on the right of visitation. Instead, the evidence in the record establishes the existence of a very close, loving relationship between [grandmother] and [the child], and that [the child]'s best interest is served by granting [grandmother] regular, unfettered visitation" (6 Misc 3d 1030[A], 2004 NY Slip Op 51846[U], *15).
Upon father's appeal, the Appellate Division affirmed Supreme Court's judgment, but modified certain terms of the visitation schedule in deference to father's wishes, relying on Troxel. In response to father's constitutional challenge, the Appellate Division observed that
"[c]ontrary to the father's contention, this Court *156 has determined that New York State's grandparent visitation statute, Domestic Relations Law § 72, is not facially invalid under [Troxel] even though it does not specifically require that parental decisions are to be given `special weight.' Our visitation statute, narrowly drafted to only afford a grandparent standing to sue for visitation when a child's parent has died or where `conditions exist which equity would see fit to intervene' (Domestic Relations Law § 72) and additionally requiring that after standing has been conferred, that the grandparent establish why visitation is in the child's best interest, necessarily gives the parent's decision presumptive weight" (27 AD3d 757, 758-759 [2d Dept 2006] [citations omitted]).
The Appellate Division further rejected father's argument that Supreme Court abused its discretion in awarding visitation to grandmother.

II.
Section 72 (1) of the Domestic Relations Law states that
"[w]here either or both of the parents of a minor child, residing within this state, is or are deceased, or where circumstances show that conditions exist which equity would see fit to intervene, a grandparent or the grandparents of such child may apply to [supreme or family court] and ... the court, by order, after due notice to the parent or any other person or party having the care, custody, and control of such child, to be given in such manner as the court shall prescribe, may make such directions as the best interest of the child may require, for visitation rights for such grandparent or grandparents in respect to such child."
Section 72 (1) derogates from the common-law rule that "grandparents [have] no standing to assert rights of visitation against a custodial parent" (Matter of Emanuel S. v Joseph E., 78 NY2d 178, 180 [1991]). The statute "rests on the humanitarian concern that [v]isits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild ... which he cannot derive from any other relationship" (id. at 181 [internal quotation marks and citations omitted]).
*157 Section 72 (1) "does not create an absolute or automatic right of visitation. Instead, the statute provides a procedural mechanism for grandparents to acquire standing to seek visitation with a minor grandchild" (Matter of Wilson v McGlinchey, 2 NY3d 375, 380 [2004] [internal quotation marks and citation omitted]). When grandparents seek visitation under section 72 (1), the court must undertake a two-part inquiry. "First, [the court] must find standing based on death or equitable circumstances"; and "[i]f [the court] concludes that the grandparents have established the right to be heard, then it must determine if visitation is in the best interest of the grandchild" (Matter of Emanuel S., 78 NY2d at 181).
But the courts should not lightly intrude on the family relationship against a fit parent's wishes. The presumption that a fit parent's decisions are in the child's best interests is a strong one. And while, as we made clear in Wilson, the problems created by parent-grandparent antagonism cannot be ignored, an acrimonious relationship is generally not sufficient cause to deny visitation. "It is almost too obvious to state that, in cases where grandparents must use legal procedures to obtain visitation rights, some degree of animosity exists between them and the party having custody of the child or children. Were it otherwise, visitation could be achieved by agreement" (Lo Presti v Lo Presti, 40 NY2d 522, 526 [1976]).
Here, grandmother has automatic standing under section 72 (1) on account of A.D.'s death. Further, record evidence supports the determination of the courts below that visitation between grandmother and the child is in the child's best interest. The father in this case is a competent parent, and Supreme Court was therefore properly "mindful" in the first instance of his right to rear the child as he saw fit. Supreme Court determined, however, that grandmother established "an extraordinarily close relationship [with the child] during the nearly five-year period that she lived with him and [father]" (6 Misc 3d 1030[A], 2004 NY Slip Op 51846[U], *14). Further, grandmother "clearly appreciate[d] and respect[ed] the separate roles that she and [father] play[ed] in [the child's] life, and wishe[d] to improve her relationship with [father] for the sake of [the child]," and there was "no credible evidence in the record substantiating [father's] claim that [grandmother] [sought] to usurp his role as [the child's] parent" (id.). Supreme Court also found that father's complaints about grandmother's caregiving skills *158 were "contrived" and his claims of ill will exaggerated and "tailored to raise the specter of family dysfunction" (id.). Supreme Court agreed with the law guardian's "determination that the relationship with [grandmother] [was] central to [the child's] well[-]being," and noted that the child, who is gifted, had "articulated a deep love for and attachment to" grandmother (id.). The Appellate Division affirmed the trial court's findings of fact, and we may not revisit them (see Karger, Powers of the New York Court of Appeals § 13:10, at 489 [rev 3d ed] ["(F)indings of fact made by the nisi prius court which have been expressly affirmed by the Appellate Division and have the requisite evidentiary support are ... conclusive and binding on the Court"]). In light of these factual findings, there is no reason to disturb the best-interest determination in this case. There was no abuse of discretion; the courts below correctly applied section 72 (1).

III.
Father contends that Domestic Relations Law § 72 (1) is facially unconstitutional in light of Troxel. "A party mounting a facial constitutional challenge bears the substantial burden of demonstrating that in any degree and in every conceivable application, the law suffers wholesale constitutional impairment" (Matter of Moran Towing Corp. v Urbach, 99 NY2d 443, 448 [2003] [internal quotation marks and citation omitted]). Moreover, the challenger "must surmount the presumption of constitutionality accorded to legislative enactments by proof beyond a reasonable doubt" (id. at 448 [internal quotation marks and citation omitted]).
The Washington statute at issue in Troxel permitted "`[a]ny person' to petition [the trial court] for visitation rights `at any time,' and authorize[d] that court to grant such visitation rights whenever `visitation may serve the best interest of the child'" (Troxel, 530 US at 60, quoting Wash Rev Code § 26.10.160 [3]). In Troxel, paternal grandparents petitioned for visitation with their grandchildren pursuant to this statute. The mother did not oppose all visitation, but sought to limit it. The trial court awarded visitation to the grandparents, "settl[ing] on a middle ground" between what the grandparents requested and the mother offered (Troxel at 71). The intermediate appeals court reversed on statutory grounds and dismissed the petition. The Washington Supreme Court then affirmed on a different groundthat the statute *159 was facially invalid under the Federal Constitution because it unconstitutionally infringed on the fundamental right of parents to rear their children.
The Supreme Court affirmed the petition's dismissal, while declining to hold the Washington statute unconstitutional on its face. Justice O'Connor's plurality opinion held, however, that "the application of [the statute] to [the mother] and her family violated [the mother's] due process right to make decisions concerning the care, custody, and control of her daughters" (id. at 75). The plurality considered it critical that there were no allegations or findings of the mother's unfitness as a parent because
"so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children" (id. at 68-69).
As a result,
"the decision whether ... an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination" (id. at 70 [emphasis added]).
The problem in Troxel was therefore not that the trial court intervened, but that it failed to employ "the traditional presumption that a fit parent will act in the best interest of his or her child" when it did (id. at 69). On the contrary, the trial court effectively applied a presumption in favor of grandparent visitation, placing on the parent "the burden of disproving that visitation would be in the best interest" of her children (id.).
Reasoning from Troxel, we conclude that section 72 (1) is facially constitutional. As Justice Altman aptly put it, section 72 (1)
"can be, and has been, interpreted to accord deference to a parent's decision, although the statute itself does not specifically require such deference. Further, [section 72 (1)] is drafted much more *160 narrowly than the Washington statute [considered in Troxel]. If the United States Supreme Court did not declare the `breathtakingly broad' Washington statute to be facially invalid, then certainly the more narrowly drafted New York statute is not unconstitutional on its face. In fact, the Court indicated that it would be hesitant to hold specific nonparental visitation statutes unconstitutional per se because `much state-court adjudication in this context occurs on a case-by-case basis.' Troxel does not prohibit judicial intervention when a fit parent refuses visitation, but only requires that a court accord `some special weight to the parent's own determination' when applying a nonparental visitation statute" (Matter of Hertz v Hertz, 291 AD2d 91, 94 [2d Dept 2002] [citations omitted]; see also Matter of Morgan v Grzesik, 287 AD2d 150 [4th Dept 2001]).
Courts in other states have likewise read their grandparent visitation statutes to encompass the constitutional protections necessary to safeguard parental rights (see Hiller v Fausey, 588 Pa 342, 361-363, 904 A2d 875, 887-888 [2006]; In re Estate of S.T.T., 144 P3d 1083, 1093 [Utah 2006]; Blixt v Blixt, 437 Mass 649, 657-658, 774 NE2d 1052, 1060 [2002]). Indeed, the plurality's decision in Troxel seemed to suggest that the Washington Supreme Court might have similarly chosen to interpret its statute more narrowly.
Finally, father also argues that section 72 (1) was unconstitutionally applied in this case. We disagree. Unlike Troxel, the trial court here did not presuppose that grandparent visitation was warranted as the jumping-off point for fact-finding and best-interest analysis. Instead, the court, emphasizing that it was "mindful" of father's parental prerogatives, employed the strong presumption that the parent's wishes represent the child's best interests, as our statute requires (see Troxel, 530 US at 69). While this presumption creates a high hurdle, the grandmother in this case surmounted it: from the time the child was almost four until he was seven, grandmother was his surrogate, live-in mother. The court then properly went on to consider all of the many circumstances bearing upon whether it was in the child's best interest for his relationship with grandmother to continuee.g., the reasonableness of father's objections to grandmother's access to the child, her caregiving skills and *161 attitude toward father, the law guardian's assessment, the child's wishesbefore making a judgment granting visitation.
Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.
Order, insofar as appealed from, affirmed, with costs.