Matter of Neilene P. v Lynne Q. (2020 NY Slip Op 02828)





Matter of Neilene P. v Lynne Q.


2020 NY Slip Op 02828


Decided on May 14, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 14, 2020

526814

[*1]In the Matter of Neilene P., Respondent,
v
Lynne Q., Appellant, et al., Respondent. (And Another Related Proceeding.)

Calendar Date: March 24, 2020

Before: Clark, J.P., Mulvey, Devine, Pritzker and Colangelo, JJ.


Cheryl L. Sovern, Malta, for appellant.
Matthew J. Sgambettera, Saratoga Springs, for respondent.
Christopher J. Obstarczyk, Latham, attorney for the child.
Karen R. Crandall, Schenectady, attorney for the child.



Colangelo, J.
Appeal from an order of the Family Court of Saratoga County (Pelagalli, J.), entered May 10, 2018, which granted petitioner's applications, in two proceedings pursuant to Family Ct Act article 6, for visitation with the subject children.
Petitioner (hereinafter the grandmother) is the mother of respondent Lynne Q. (hereinafter the mother) and the maternal grandmother of the subject children, a daughter (born in 2007) and a son (born in 2012). Respondent Raymond R. (hereinafter the father) is the son's father and the daughter's stepfather and, by all accounts, the only father that the daughter has known.[FN1] The mother and the father separated in 2015 and, in 2016, were awarded joint legal custody of the son with primary physical custody with the mother, and the father was given regular parenting time after work four days per week and on alternating weekends. That order further provided that the daughter, who also lived with the mother, would "be included in the visits with the [father] as the parties can agree"; it was undisputed that, in practice, the children consistently visited with the father together. Although the grandmother was involved in the children's lives until June 2016, the mother cut off all contact between them after the grandmother made a hotline call to Child Protective Services (hereinafter CPS); that report was based upon concerns about the welfare of the mother and the children emanating from statements and text messages from the mother to the father and the grandmother. After that, the father continued to permit the grandmother to have contact with the children during his parenting time, which he discontinued in January 2017 solely because the mother filed a petition against him seeking sole custody and to bar him from allowing the grandmother any access to or contact with the children. The grandmother thereafter filed these petitions seeking visitation with the children.
At trial, the mother, the father and the grandmother testified, and the disputed issues were the extent of the grandmother's relationship with the children before contact was cut off and the validity of the mother's reasons for doing so. The father, supported by both attorneys for the children, advocated in favor of continued contact between the grandmother and the children. After a Lincoln hearing with the daughter, Family Court granted the grandmother's request for visitation with the children, finding that she had standing to seek visitation and that it was in their best interests to resume visitation with her. The court directed that visitation occur during the father's scheduled parenting time, at his discretion. The mother appeals.[FN2]
We affirm. The mother challenges Family Court's determination, contending that the grandmother lacked an established relationship with the children as required for standing and that visitation was not in their best interests. We are unpersuaded. Pursuant to Domestic Relations Law § 72, where, as here, the children's parents are alive, "grandparents may seek visitation with their grandchildren where they can establish circumstances in which 'equity would see fit to intervene'" (Matter of Susan II. v Laura JJ., 176 AD3d 1325, 1327 [2019] [internal quotation marks and citation omitted], lv denied 34 NY3d 909 [2020], quoting Domestic Relations Law § 72 [1]; see Matter of Wilson v McGlinchey, 2 NY3d 375, 380 [2004]). This showing can be made by establishing "'a sufficient existing relationship with their grandchildren, or in cases where that has been frustrated by the parents, a sufficient effort to establish one, so that the court perceives it as one deserving the court's intervention'" (Matter of Susan II. v Laura JJ., 176 AD3d at 1327 [brackets omitted], quoting Matter of Emanuel S. v Joseph E., 78 NY2d 178, 182 [1991]). As such, "essential components of the standing inquiry are the nature and extent of the grandparent-grandchild relationship and the nature and basis of the parent's objection to visitation" (Matter of Susan II. v Laura JJ., 176 AD3d at 1327 [internal quotation marks and citation omitted]).
With regard to standing, the mother testified that she has four children, a 17-year-old son who was removed from her care after a CPS call and placed in the custody of the grandmother's sister, the subject children and a child born to her in 2016. The mother testified that the subject children did not have a close relationship with the grandmother, they did not see one another often and only had contact with her at family functions. She explained that she cut off contact after a CPS report that she believed the grandmother had made. She opposed any contact because she was trying to break all ties with that side of her family and "heal" based, in part, on her assertion that she had been sexually abused at age nine by the grandmother's then-boyfriend; when the grandmother later learned of this, she (and other maternal relatives) refused to believe it, continued the relationship and lost custody of the mother until she returned around the age of 16, pregnant with her first child. According to the mother, the grandmother regularly harassed and criticized her, and she feared that her children would be taken away. However, the mother admitted that she and her oldest son and, later, she and her daughter, had lived with the grandmother for periods of time, she had accepted financial and other support from her and had encouraged the grandmother to take the children for visits or to babysit. The mother allowed the daughter to go on yearly camping overnight trips with the grandmother and her current partner and permitted the son, then age 4, to join them in May 2016. Although the mother expressed animosity toward the grandmother, she had no fear for their physical safety.
The father, who lives with his girlfriend and has no other children, testified that, prior to his separation from the mother in 2015, the mother had no concerns regarding contact between the children and the grandmother, did not express anger toward the grandmother and never told him that she had been sexually abused. Before being cut off, the children were "pretty close" to the grandmother and regularly saw her at family events, holidays and on other informal occasions; in addition to camping trips, the daughter stayed overnight with the grandmother approximately 12 times and the son stayed overnight twice. The grandmother, a 26-year state employee, described a close relationship with the children, supported by photographs dating back to 2007 and up through 2016 depicting her involvement — along with the mother and other maternal relatives — in the lives of the children at family activities and holidays, the daughter's dance recitals, camping, birthdays and summer outings. She described speaking to the mother regularly until June 2016, when the mother became angry about the CPS call, disclosed the earlier abuse for the first time and cut off contact. The grandmother admitted making the CPS call in 2016 after the mother, who was pregnant and had a mental health history, made statements regarding the children that reasonably caused her concern and the father had conveyed that the mother may be suicidal. Her account of her regular, amicable contact with the mother was also supported by text messages admitted into evidence. The grandmother recounted watching the children for her, permitting the mother to live with her at two different points, each time with one of her children, providing financial support, and attending their various family, holiday and school events. The grandmother explained that she had been through several years of rigorous cancer treatments since 2010, which had periodically limited her contact with the children, but that she otherwise was a regular part of their lives.
Notably, the grandmother pursued visitation through the father even after the mother frustrated it, and visitation was requested during the pendency of this proceeding. The fact that no visitation occurred after January 2017 due solely to the mother's actions does not undermine the grandmother's consistent efforts to maintain a relationship with the children. Given the testimony of the father and the grandmother, which Family Court credited, regarding the nature and extent of the grandmother's relationship with the children, and the evidence submitted, including photographs, text messages and the Lincoln hearing, the court properly concluded that the grandmother had standing (see Matter of Susan II. v Laura JJ., 176 AD3d at 1327; Matter of Vandenburg v Vandenburg, 137 AD3d 1498, 1499 [2016]).
As standing was established, we turn to the best interests determination, which "requires evaluation of a variety of factors, including the nature and extent of the existing relationship between the grandparent and child[ren], the basis and reasonableness of the parent's objections, the grandparent's nurturing skills and attitude toward the parent, the attorney[s] for the child[ren]'s assessment and the child[ren]'s wishes" (Matter of Ferguson v Weaver, 165 AD3d 1397, 1398 [2018] [internal quotation marks, brackets and citations omitted]; accord Matter of Susan II. v Laura JJ., 176 AD3d at 1327; see Matter of Vandenburg v Vandenburg, 137 AD3d at 1499). The father testified that he favored visitation because the children were close to and loved the grandmother, were affectionate with her, enjoyed talking to her, asked to see her, missed her and needed her in their lives. He believed that they would benefit from continuing a relationship with her. The grandmother's testimony and evidence reflected her substantial contact with both children since birth. The mother did not testify to any recent poor parenting skills by the grandmother or concerns regarding the children's safety when with her, and her account of the 2016 CPS call did not establish that it was made without foundation or with malice; indeed, the testimony established reasonable grounds for the grandmother's concerns.
As Family Court alluded to, the mother's testimony regarding her and the children's relationship with the grandmother was not consistent with the evidence or the mother's past actions up until June 2016, and she "did not offer a compelling explanation for the intense animosity which she has toward the [g]randmother." Animosity by a parent toward a grandparent is not — standing alone — a ground for denying visitation under circumstances such as these (see Matter of E.S. v P.D., 8 NY3d 150, 157 [2007]; Matter of Laudadio v Laudadio, 104 AD3d 1091, 1093 [2013]). "This Court accords great deference to Family Court's factual findings and credibility determinations given its superior position to observe and assess the witnesses' testimony and demeanor firsthand, and will not disturb its [visitation] determination if supported by a sound and substantial basis in the record" (Matter of Daniel XX. v Heather WW., 180 AD3d 1166, 1167 [2020] [internal quotation marks, brackets and citations omitted]). The credited testimony, the evidence and the arguments of the attorneys for the children support Family Court's conclusion that the ordered visitation is in the best interests of the children.
Clark, J.P., Mulvey, Devine and Pritzker, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: Family Court determined that, based upon the law of the case from a prior decision, the daughter's biological father was not entitled to notice or to appear in these proceedings.

Footnote 2: The father did not submit a brief on appeal.