OPINION OF THE COURT
Lewis Bart Stone, J.
This proceeding was commenced pursuant to article 78 of the Civil Practice Law and Rules by notice of petition dated July 13, 2006 to “strike down” those portions of the Citywide Standards of Discipline and Intervention Measures (the Standards) promulgated by the Chancellor of the New York City School District which forbid students from bringing cellular telephones (cell phones) into public schools in the New York City School District (the Cell Phone Rules) without authorization.
The petitioners are eight parents who have children presently enrolled in public schools in the city and the Chancellor’s Parent Advisory Council. Respondents are the New York City Board of Education, doing business as New York City Department of Education, Joel I. Klein, as Chancellor of the New York City School District, and Michael R. Bloomberg, as the Mayor of the City of New York. For simplicity, the respondents will hereinafter be collectively referred to as “DOE.”
The challenged Cell Phone Rules are a single item in the 26-page Standards adopted by DOE to carry out DOE’s obligation *546 to adopt a code of behavior under Education Law § 2801.[1] The Cell Phone Rules, denoted as prohibition level 1, A04 for kindergarten through grade 5, and B05 for grades 6 through 12 under the list of infractions (collectively, the Cell Phone Rules), proscribe “[Wringing prohibited equipment or material to school without authorization (e.g., cell phone, beeper, or other electronic communication/entertainment devices).”[2]
The Standards are structured to set forth five escalating levels of disruptive behavior. The lowest level, level 1, is insubordinate behavior, level 2 is disorderly disruptive behavior, level 3 is seriously disruptive or dangerous behavior, level 4 is dangerous or violent behavior, level 5 is severely dangerous or violent behavior. Standards level 1 lists 10 proscribed behaviors for kindergarten through grade 5 and 12 for grades 6 through 12, which include the Cell Phone Rules. For each level of infraction the code provides for level appropriate “possible disciplinary responses.” The Standards also include a five-page “Bill of Student Rights and Responsibilities, K-12.”
Petitioners conceded at oral argument that they do not dispute that DOE, acting under Education Law § 2801, could restrict the use of cell phones by students on school premises, recognizing that unregulated use of cell phones in schools could present a substantial probability of disruption of the learning process. Petitioners claim, however, that enforcing a ban on use, not possession, of cell phones within school buildings would be both sufficient and appropriate to address any problem of disruption of the schools, and seek review under CPLR article 78 to attack that portion of the Cell Phone Rules which bans the possession of cell phones in schools. Petitioners also claim that the ban of cell phone possession in schools violates certain rights of petitioners and their children under the Federal and State Constitutions.
DOE responded that the decision to ban possession as well as use was not subject to challenge as there was a rational basis for such decision and that the Cell Phone Rules ban on possession violates no constitutional right of petitioners or their children.
*547 I. Initial Procedural Issues
Petitioners commenced this matter as a hybrid proceeding, joining an action for declaratory judgment with the petition under CPLR article 78. Petitioners further assert that as a result this proceeding must also be treated as a plenary action, according the petitioners all of the accouterments and procedural benefits of an ordinary action, including discovery, and have moved for leave to conduct such discovery. DOE opposed the joinder of a special proceeding under CPLR article 78 with an action for declaratory judgment, asserting that the CPLR article 78 proceeding was the proper vehicle for the resolution of all merits of this dispute and further asserted that this court should not, in any event, in the CPLR article 78 proceeding, authorize the discovery sought. DOE also asserted that the petition should be dismissed for the failure of the petitioners to comply with statutory notice requirements and that by reason of the nature of the questions presented, petitioners’ claims are not justiciable. Several persons also sought to be permitted to appear as amicus curiae.
A. Joinder of Article 78 Proceeding and Plenary Action for Declaratory Judgment
Petitioners seek to join a CPLR article 78 proceeding and a plenary action for declaratory judgment on the grounds that certain of their claims may only be determined in a CPLR article 78 proceeding and the other claims, under the Due Process Clause of the New York Constitution (art I, § 6) and under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, may only be resolved by a plenary action for declaratory judgment.
In New York, a direct constitutional attack on a statute or regulation may only be brought by an action for declaratory judgment. (Board of Educ. of Belmont Cent. School Dist. v Gootnick, 49 NY2d 683, 687 [1980] [“an article 78 proceeding may not be used to test the constitutionality of a legislative enactment”].) Although petitioners’ constitutional claims that the Cell Phone Rules violate the Federal and State Constitutions might arguably be determined under CPLR article 78 provisions allowing a challenge of a decision of a body on the ground that it was in violation of law, as both Constitutions are respectively the supreme law of the United States and State of New York, Gootnick (supra) effectively rules out this approach. It is also well settled that in New York, a person seeking to review a de *548 termination of a body must proceed by article 78. Courts, however, may convert an action for a declaratory judgment to an article 78 proceeding or vice versa where it appears that the wrong route has been selected.
Courts have, in several cases, recognized that it is not improper to join both an article 78 proceeding with an action for declaratory judgment to resolve an entire dispute where the issues require different procedures for their resolution. (See, e.g. Matter of Tommy & Tina v Department of Consumer Affairs of City of N.Y., 117 Misc 2d 415 [Sup Ct, NY County 1983], affd 95 AD2d 724 [1st Dept 1983], affd 62 NY2d 671 [1984]; Matter of Heimbach v Mills, 54 AD2d 982 [2d Dept 1976]; Matter of Kovarsky v Housing & Dev. Admin, of City of N.Y., 31 NY2d 184 [1972].) Accordingly, this court is not barred by precedent in allowing such joinder. The cases, however, do not make it clear whether such joinder is required or is optional as a matter of court discretion.
To the extent joinder is discretionary, this court, in the interests of judicial efficiency, and because all parties are represented and the court need not delay in reaching its determination, finds it is appropriate to join such claims. Accordingly, this court need not determine whether such joinder is merely permissible or is required. DOE’s objection to such joinder is hereby overruled.
B. Failure to Comply with Statutorily Mandated Conditions Precedent to Litigation
DOE asserts that this court lacks subject matter jurisdiction over this controversy by reason of petitioners’ failure to comply with the condition precedent to commencing any action or proceeding against DOE, which DOE claims is mandated by Education Law § 3813 (1), which provides in relevant part that:
“No action or special proceeding, for any cause whatever, except as hereinafter provided, relating to district property or property of schools provided for in article eighty-five of this chapter or chapter ten hundred sixty of the laws of nineteen hundred seventy-four or claim against the district or any such school, or involving the rights or interests of any district or any such school shall be prosecuted or maintained against any school district, [or] board of education . . . unless it shall appear by and as an allegation in the complaint or necessary moving *549 papers that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim, and that the officer or body having the power to adjust or pay said claim has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.”
In fact, no formal claim was filed with DOE relating to this proceeding. Accordingly, DOE asserts this court has no jurisdiction to proceed and must reject petitioners’ claims.
The Court of Appeals noted that the purpose of Education Law § 3813 (1) is:
“ ‘to give a school district prompt notice of claims “so that investigation may be made before it is too late for investigation to be efficient”.’ . . . The essential elements to be included in the notice are the nature of the claim, the time when, the place where and the manner in which the claim arose.” (Parochial Bus Sys. v Board of Educ. of City of N.Y., 60 NY2d 539, 546 [1983].)
For this reason, courts have regularly held that actions for declaratory judgment challenging a school district’s compliance with law, but not seeking monetary damages need not comply with the condition precedent established by Education Law § 3813 (1). (See, e.g., Troy Towers Redevelopment Co. v City of Troy, 51 AD2d 173 [3d Dept 1976], affd 41 NY2d 816 [1977] [challenge to school district’s failure to maintain certain schools]; Matter of Rampello v East Irondequoit Cent. School Dist., 236 AD2d 797 [4th Dept 1997] [taxpayers’ challenge to bonuses paid by school district to retiring principal].)
Further, CPLR article 78 expressly authorizes special proceedings in the nature of certiorari and prohibition against “bodies” of which DOE is one. Such proceedings may be commenced to overturn decisions of a body or prevent actions by a body, both situations where monetary claims against a school district are not in issue. The rationale of there being a need to investigate in order to defend, which prompted section 3813 (1), is also absent in such cases. As CPLR article 78 proceedings are principally overwhelmingly based on the existing records, there is rarely any need to investigate, only to certify the existing record.
Thus, as in neither their action for declaratory judgment nor in their article 78 proceeding do petitioners here seek damages, *550 and as DOE need not make a factual investigation to defend against these claims (DOE’s own contentions in its arguments and other submissions challenging petitioners’ motion for discovery, that no discovery is needed in this matter, confirms this position), it is clear that section 3813 (1) is not applicable. DOE’s defense on this ground is therefore rejected.
C. Discovery
Discovery of relevant factual matters is an inherent right of a party in a plenary action. In a CPLR article 78 proceeding, discovery may also be permitted, but only at the proper discretion of the court. Because most matters under CPLR article 78 are commenced to review an existing record, discovery is not common in such proceedings.
Here, petitioners have applied to the court for leave for discovery, setting forth the matters they wish to have disclosed. Although the article 78 proceeding and the action for declaratory judgment may proceed together, the court must apply the usual rules relating to discovery to them as if they were separate matters. Thus, discovery under each must be considered solely with respect to the propriety of discovery vis-á-vis the issues and claims under such rubric. Under its “article 78 hat,” the court must determine, for such purposes, whether to allow such discovery as a matter of the proper exercise of its discretion. Under its “declaratory judgment hat,” the court must apply the usual rules applicable to ordinary actions to determine whether such discovery should proceed.
Applying such rules, this court denies petitioners’ motion for discovery. Although petitioners have an “as of right” basis for discovery in their action for declaratory judgment, such discovery must in any event be limited to those matters which are relevant to the claims made. As the claims made in such action are that the Cell Phone Rules violate petitioners’ rights under both the New York and Federal Constitutions, questions as to the process and factual basis for the adoption of the Cell Phone Rules, which are the areas of discovery sought, are irrelevant. If petitioners’ constitutional rights are violated, it hardly matters why or with what basis of support the Cell Phone Rules were adopted.
The issues in the article 78 proceeding are different from those in the action for declaratory judgment as they relate to issues of the rationality and basis of the Cell Phone Rules. Accordingly, the motion for discovery does not fail for irrelevance *551 when reviewed in such context. In the context of article 78, however, discovery is discretionary with the court. After considering the issues in the article 78 portion of this case, this court, in its discretion, finds the issues in the dispute between the parties under article 78 may be fully and fairly determined without the need for discovery. The issue, in the article 78 portion of this dispute, as discussed below, relates to whether there is any rational basis for the Cell Phone Rules as they are written. This court does not believe discovery is necessary to enable the parties and the court to address such issues in a fair and comprehensive manner. The oral arguments presented by the parties, wherein issues of rational basis were fully argued, give retroactive support to this conclusion. Accordingly, petitioners’ requests for discovery are hereby denied.
D. Justiciability
DOE asserts that because the issue in dispute involves education and the decisions of an education agency, this court has no authority to review the Cell Phone Rules and must therefore dismiss petitioners’ claims. In this assertion DOE is patently wrong.
DOE’s error is clear both with respect to petitioners’ claims under CPLR article 78 and petitioners’ constitutional claims under petitioners’ action for declaratory judgment.
Decisions of school boards and other educational entities have been so routinely subject to review by the courts under CPLR article 78 so as to make DOE’s contention almost frivolous. Recent cases in which the Court of Appeals has ruled on the merits of petitions under CPLR article 78 include Matter of Madison-Oneida Bd. of Coop. Educ. Servs. v Mills (4 NY3d 51 [2004] [challenging a determination of the State Commissioner of Education]), Matter of Davis v Mills (98 NY2d 120 [2002] [challenging a determination of the State Commissioner of Education]), and Matter of McManus v Board of Educ. of Hempstead Union Free School Dist. (87 NY2d 183 [1995] [challenging a termination of an acting school principal by a school board]). There are also numerous cases in which the Appellate Division and Supreme Court have addressed challenges to the decision of an educational authority under CPLR article 78.
However, the fact that the court may review rules or other actions of an educational body under CPLR article 78 does not give the court carte blanche to second-guess or decide for itself what choice DOE should have made in this case. Under CPLR *552 article 78, a court must accord DOE great deference in its decisions made to carry out its statutory duties as a court must also defer to the expertise of any other state or municipal agency acting under appropriate authority within an area of its expertise. Where the decision or rule of DOE has been authorized by law and DOE has acted in a manner consistent with law that is not arbitrary and capricious, the appropriate response of the court is to uphold DOE’s decision. The mere fact that DOE deals in educational matters does not foreclose review by this court as to whether or not in fact and in law there exists a basis for a court to set aside a decision or rule of DOE on this standard. Accordingly, this court rejects DOE’s contention that this dispute is not justiciable under CPLR article 78.
DOE’s claim that petitioners’ constitutional claims are not justiciable is even less sustainable. While there are limits of justiciability of certain controversies, New York State Constitution, article VI, § 7 (a) confers upon the Supreme Court “general original jurisdiction in law and equity.” While the Constitution may otherwise expressly or implicitly[3] make exceptions to this general jurisdiction, as there is no exception in the Constitution this court presumptively has a general power to consider constitutional challenges to the actions of a public educational authority such as DOE.
Petitioners claim that DOE has transgressed their constitutional rights is therefore a matter that falls within the general jurisdiction of this court, making the claim justiciable.
Again, the mere fact that it is justiciable does not of necessity indicate the validity of the claim on its merits. It only means that this court has jurisdiction to consider the merits of petitioners’ constitutional claims and to determine them.
E. Amicus Curiae
Two applicants sought to submit material to the court in this controversy, as amicus curiae. Because briefs of amici have become more common in recent years, this court believes it is appropriate to explain the court’s action for its decision to reject these submissions and, perhaps in such context, give guidance for such submissions.
*553 The CPLR provides for the process of intervention and the addition of parties to a litigation in certain limited instances.[4] Beyond such rights granted by the CPLR, nonparties often attempt to submit other material to a court to help or influence the court in making a decision. Because no such additional submission is as of right, a court must be free to reject or accept such a submission at its discretion, and in exercising such discretion, may adopt its own general rules to govern amici if it wishes.
As there is no right to file an amicus brief, the determination or adoption of a rule by one court does not bind another court. The policies of other courts whether by rule or decision are no more than exemplars or suggestions to this court which may by its own court rule or by an ad hoc determination decide whether to receive a particular amicus.
It is undisputed that an amicus, as the term is translated, can be a real friend to the court in a complex case, alerting the court to unpresented implications to persons not parties to the action and bringing to the court’s attention cases or recent reversals or affirmances of authorities cited by the parties, or other matters, such as legislative history relevant to the matter before the court.
Unfortunately, the process has deteriorated and some of those claiming to be amici are really enemies posing in friends’ clothing. While help for the court is commendable, the amicus process has often become a burden. As a court should consider each application to submit an amicus before accepting or rejecting it, each ill-considered amicus application puts an unnecessary and unwarranted burden on the court, as such application must be read and addressed, if only to be rejected.
The contents of too many amicus submissions have gone far past their purpose. For example, as the proper function of an amicus is to advise the court of the law and the implication on other matters of a decision of the court on the matter before it, the inclusion of factual material is almost always improper. Factual material submitted to the court by an amicus should not be subject to less scrutiny and contravention by opposing parties than factual material submitted by a party. Unless the court makes the amicus a party, such is impossible when factual material is submitted by an amicus.
*554 Similarly, an amicus that merely alerts the court to its “position” or submits petitions signed by persons interested in a particular result improperly attempts to influence the court to make its decision on other than on the facts and the law. If the law and facts support a particular result, the court must reach such result rather than conform its decision to political or popular pressure. Such material should not even be submitted.
The final type of improper amicus submission is one which merely reiterates arguments or authority already submitted to the court. This is wasteful and essentially frivolous as it can add nothing to the process except to waste the court’s time (as the court must at least read an application to submit amicus material to decide if it should accept it), and can only act to delay the court in completing its duty to render a timely decision.
Unfortunately, there is also no appropriate route for the court to protect itself against frivolous or improper amicus submissions or their use as a tactic to delay a proceeding, except, perhaps only where a party has been found to have participated in or induced an amicus to file. Existing sanctions which create disincentives to frivolous or dilatory conduct of parties extend only to the parties to a litigation and not to an amicus. (See Rules of Chief Administrator of Cts [22 NYCRR] § 130-1.1.)
This court has not established part rules and has opted instead to address amicus filings on an ad hoc basis. On such basis, in its discretion, this court has rejected the proffered amicus submissions for one or more of their failings as set forth above.
II. Article 78 Claims
An administrative agency’s construction and interpretation of its own regulations and of the statute under which it functions is entitled to the greatest weight. (Matter of Herzog v Joy, 74 AD2d 372 [1st Dept 1980], affd 53 NY2d 821 [1981].) However, the principle of article 78 review that a court must defer to the expertise of an agency with respect to matters within the agency’s jurisdiction does not mean, as DOE contends, that the court must capitulate to the agency’s determination.
The scope of review appropriate here is the traditional “arbitrary and capricious” standard as set forth in CPLR 7803.[5] While such standard must be used here, as this article 78 *555 proceeding is in the nature of a “prohibition” proceeding, the standard must be applied in such context.
While a court in reviewing an adjudication by an agency must set aside an arbitrary decision, the mere fact that the Cell Phone Rules may be arbitrary is an insufficient basis for the court to grant the petitioners the relief they seek. Most rules themselves are inherently arbitrary as they set clear boundaries in what may be disputable territory absent such rules. A rule fixing a time to reply to some event at 10 days is arbitrary, but such rule may not be challenged if the authorizing statute or regulation does not prohibit it and 10 days is not unreasonable. Again, a school’s decision to teach ancient history subsequent to teaching American history would be challengeable only where the school made the decision in violation of the school district’s rule to teach ancient history first, but the rule itself would not be challengeable, even though the choice of sequence itself was arbitrary. Thus, cases explicating the standard of “arbitrariness” under adjudicatory cases under the certiorari jurisdiction of article 78 do not equally apply under the prohibition jurisdiction of article 78 where it is a rule, rather than an adjudication, which is challenged.
The standard for review of a rule or regulation is, instead, whether it was adopted within the authority of the enabling statute and whether there was some rational basis for its adoption.[6] Under this standard, the court must look to the authorizing statute as well as any other legal constraint on the adoption of the rule. Thus, the rational basis test partially subsumes a capricious test. For example, as a general rule, banning blue but not green cell phones would most likely be capricious (as well as arbitrary) as the distinction would probably not be rational.
As petitioners have conceded that a ban on cell phone use by students in schools could be proper and enforceable, and do not challenge the existence of statutory authority to make rules relating to cell phones in schools, but only challenge whether it was proper to ban cell phone possession in order to enforce a ban on their use, the question for this court under CPLR article 78 is whether DOS’s decision to ban possession had some rational basis for its adoption. After considering the submissions of the parties and their oral arguments, this court *556 concludes that DOE did have a rational basis to adopt the Cell Phone Rules.
A. Cell Phones, What Are They?
In considering whether DOE acted appropriately under Education Law § 2801 to adopt the Cell Phone Rules, it is necessary to first consider just what a cell phone is so that the rationality of DOE’s actions may be reviewed in an appropriate factual context.
Complicating any analysis is the fact that cell phones are evolving at a dizzying pace. The cell phone of yesterday is not the same as the cell phone of today and the cell phone of today will not be the same as the cell phone of tomorrow. Further, cell phones of today differ enormously in their capabilities and configuration. While walkie talkies and radio phones have been available for over half a century, cellular telephone technology was first publicly demonstrated on April 3, 1973 at which time there was a single cell antenna in Manhattan which had been erected for such demonstration.[7] However, it was not until a final Federal Communications Commission ruling on May 21, 1981, over eight years later, that cellular telephones were authorized to be made available to the American public. Only after that date could carriers commence construction of cell networks and sell cell service.[8] The new technology, by developing a network of local cells to which a portable telephone could connect, enabled virtually an unlimited number of persons to use a limited electromagnet spectrum to telecommunicate without a fixed base, by multiplying cells as needed. While originally a luxury good, with spotty coverage in a few cities, the industry is now almost ubiquitous worldwide, and the cost of a cell phone and the price of a call has plummeted, with cell service now almost universally available to Americans.[9] As the market grew so did the incentive for inventors to innovate and they have done so. Although the original cell phones only rang for an incoming call, most now can be set to signal incoming calls by vibration. More and more cell phones have instant message or e-mail capacity, memory into which memoranda may be entered and retrieved and, more recently, built-in cameras. *557 Cell phones with the capacity for global positioning systems, internet access, calculators, music, video, “Bluetooth” capability and other features are now widely available on the market. While there may be some cost premium for some of these features, the marginal pricing for premium services is not large, continues to erode and many of the features originally billed separately are now offered for “free,” with the carrier profiting from additional customer usage. Thus, most cell phones are not merely portable telephones.
B. Rationality of the Cell Phone Rules
Petitioners suggest that permitting possession of cell phones, but banning their use, would fully meet a school’s needs to regulate distractions. They have also suggested specific actions in connection with such an approach to meet some of the reasons proffered by DOE to show that a possession ban had a reasonable basis. This approach misunderstands the legal structure of rulemaking and the role of a court in the review of a rule established by an administrative agency. The courts may not review rule-making choices between alternates; the choices as to how to formulate a rule is the responsibility of the agency, and the court may only set such rule aside if there was no rational basis for the choice made by the agency. Notwithstanding that a court may feel that a different choice would have been better, it is not the province of a court to make such judgment.
After considering the arguments of the parties, this court concludes that the questioned aspect of the Cell Phone Rules, i.e., the ban on possession of cell phones in schools, without prior authorization (as distinct from a ban on cell phone use), has a rational basis. Accordingly, this court may not set them aside, as petitioners have sought, under the court’s CPLR article 78 powers.
Any enforcement system focusing on use, rather than possession, requires teachers, rather than only security personnel at the school door, to observe and enforce the ban and to become involved in confronting students and making punishment decisions, in detriment to their pedagogical mission, both by reducing their time teaching and by increasing their perception as an adversary to students. Further, it is not inappropriate to conclude that a use ban may be more disruptive than a possession ban. Under a use ban, cell phones will be carried by teenagers and tweens (and maybe even younger children) whose self- *558 control may not be perfectly formed.[10] DOE therefore had a rational basis to project that a possession ban would lead to less distraction and disturbance to the educational mission of the school. One alternative proposed by petitioners, having schools designate a person to collect cell phones at the door, keep track of them and deliver them to the students as they leave, adds a salary and administrative burden which would divert scarce funds from other educational priorities, to say nothing of new liabilities for lost or broken phones while in the custody of the school. The existence of such burdens constitutes a rational basis for DOE to have rejected such a solution.
The courts themselves recognize that cell phone use is a distraction as well as an instrument to communicate or secure outside information when there should be no distraction, communication or outside information. While the Supreme Court in New York County bans the use of cell phones in courtrooms without the permission of the court, and such phones are required to be turned off, counsel, litigants, jurors and spectators regularly possess cell phones in courtrooms; this court has regularly observed that a ban on use does not always assure that cell phones do not ring in the courtroom at inappropriate times and cause disturbances. However, when they do, the court, unlike a teacher in a classroom, has the benefit of armed court officers to enforce the use ban and to assure the restoration of order. During criminal jury deliberations, where it is even more important that there be no outside communications, possession of cell phones by deliberating jurors is generally banned in Supreme Court and court officers collect and hold the jurors’ cell phones during deliberations. The federal District Court for the Southern District of New York has elected instead to ban possession rather than mere use to avoid problems raised by cell phone use, the same conclusion DOE reached and which is being challenged here. Possession of cell phones within the federal court building is banned for litigants, jurors, counsel and the general public to ensure proper court decorum. Federal court officers collect and check cell phones at the door of the courthouse.
An additional rational basis for the challenged aspect of the Cell Phone Rules may be found in the need to have a rule which can address the changing nature of cell phones. The dynamism *559 of the cell phone industry and its continuing evolution as discussed above presents further problems for any regulator to craft an appropriate response to the presence of disruptive cell phones. At oral argument, petitioners also suggested that it might be possible, for example, to restrict possession of cell phones in schools to those cell phones which only performed basic telephone functions, or to cell phones which could be programmed (as they have been at one college) to be shut off during the schedule of the students’ classes.
While such an alternate may be possible, there is no assurance that the equipment or software is commercially or practically available to DOE at any reasonable cost and each “fix” clearly has its own problems and costs. Restricting in-school cell phones to models which would only ring and not vibrate (to assure cells were turned off in school), had no capacity to instant message or e-mail (so as to eliminate student note passing), no memory (to eliminate crib notes), no cameras (to avoid other diversions), no Bluetooth (so that a teacher would be able to easily observe the improper use of a cell phone), and no memoranda or Internet access (to prevent cheating) would require each school to inspect each phone each day against an ever-changing list of models, and impose on school personnel the responsibility to make decisions which would be time-consuming. Such limitations might also require many parents to replace nonqualifying cell phones with qualifying ones for their children’s school use. Programming cell phones, while possible in the context of a private college where the cost can be passed on to students and where enforcement is possible by a credible threat of expulsion, is hardly a model for an urban public school system of a million children.[11]
The petitioner parents have expressed rational concerns for the safety and well-being of their children because the possession ban leaves their children “incommunicado” as they go to and from school. While it is true that until recently there were no cell phones, and children and parents coped without them, many parents and children have changed their behavior to rely on cell phones more and more. Their availability and proliferation has also negatively impacted the pay telephone industry. Since the introduction of cell phones, the number of pay telephones in the city has dramatically decreased, reducing the number of pay telephones available to a child for calling home *560 or a parent when the child is between home and school. Whether this reduction in the number of pay telephones translates to a similar dramatic reduction of pay telephone sites or merely the number of phones at formerly multiphone sites is, however, not clear. Further, as there was never any prior assurance that any particular child at any particular school had access to any pay telephone on the child’s route home, it can hardly be said that even a substantial decrease of the number of places where pay telephones are available would by itself constitute an appropriate basis to attack the Cell Phone Rules.
A school’s need to avoid distractions and problems inside of the school does not mean that cell phones may not be, as a general matter, beneficial outside of school. The Cell Phone Rules do not restrict the possession or use of cell phones by children outside of their school building. The problem is what to do with the cell phones in the transition between in and out of school. In-school lockers may not necessarily be a universal solution; not all students or schools have lockers, and lockers are too often located at places deep inside of the school making it virtually impossible to monitor whether a student’s cell phone was indeed deposited. On the other hand, magnetometers at the entrance to a school, which are commonly used to prevent the introduction of weapons into a school, can also be used to enforce a ban under the Cell Phone Rules. To enforce the alternate of securing of cell phones in students’ lockers during school hours, even where lockers exist would require many magnetometers, pat down searches and would probably be more arbitrary than a general ban, as students at schools with lockers would be treated differently than students at schools without. Further, at schools where students have different schedules and arrive and leave at different times, enforcement of any rule requiring the deposit of cell phones in lockers during school hours would be complicated as students in such a school would carry their cell phones in school at different times, i.e., when they arrived and went to their lockers to deposit the phone and at the end of the day when they retrieved their phones from the lockers. These considerations also illustrate additional rational basis for the challenged portion of the Cell Phone Rules.
The concept of lockers situated between the school and entrances and where magnetometers would be placed was also discussed. While perhaps the use of such lockers could meet the needs of the schools and the desires of petitioners, installing lockers at such locations is not without cost and would require *561 significant diversions of funds from a fully committed school budget.[12] The “solution” also assumes the availability of space for such lockers in each of the City’s more than 1,400 schools. Further, the cost of their maintenance or replacement for vandalism must be addressed. This illustrates an additional rational basis for DOE not to have elected this proposed “solution.”
As petitioners concede that banning of cell phone use in a school is a proper goal, the court finds that banning possession in the school is not an irrational method to accomplish such goal. It is also clear from the recitation of the problems listed above, petitioners were unable to advance a practically viable universal alternative which could be appropriately ordered by a court to be applicable to all of the schools in the New York City district to ban only the use but permit the possession of cell phones in schools. The lack of such an alternative provides an additional rational basis for adopting a possession ban rather than merely a use ban.
C. Special Circumstances
In any event, the Cell Phone Rules themselves are not absolute rules. What is forbidden is the carrying of a cell phone “without authorization.” As there is no further restriction on “authorization,” under the Rules, each school’s principal may address specific situations at such school. Thus, a principal could authorize a student to carry a cell phone where such student had a special need to do so or authorize students in general to do so where cell phones might not be disruptive for *562 certain after school activities on school grounds[13] such as football games. As the Cell Phone Rules contain no restriction as to how or when authorization may be granted, there is nothing in the record to require this court to presume that such permission would be improperly withheld. Clearly, the Cell Phone Rules could allow the proper authorities at a school to consider factors such as a specific student’s need to communicate with a parent, or such student’s willingness to have a limited use cell phone, or such student’s ability or maturity to abide by nonuse rules, or the neighborhood availability of pay phones or of commercial lockers or depositories and other factors.
Thus, the Cell Phone Rules themselves address the possibility that in particular instances a school may determine whether the benefits of a cell phone’s possession by a student (or students) in school may outweigh the disruptive factor. That the Rules require authorization from the school, however, as distinct from making the decision one of parents, is rational. To subject a school to varying conflicting views of different parents before discipline could be maintained in the school is to provide no basis for a uniform rule of discipline. Not only does a school have the right to maintain its own views of discipline to the extent it does so in a reasonable, legal and constitutional manner, school districts are mandated under Education Law § 2801 to adopt uniform rules to regulate discipline in the schools.
D. Petitioners’ Examples
The petitioners presented a series of specific examples of instances where cell phones were or could have been used to prevent a dire circumstance to a particular child. While DOE did not contest the veracity of any of these examples, the court notes that two of the eight examples presented involved the use of a cell phone inside of a school, rather than outside of a school, the prohibition of which, petitioners concede, was a proper exercise of DOE’s rule-making powers.
Examples, except perhaps as reductio ad absurdum, rarely form an appropriate basis to overturn an administrative rule. The formulator of a rule must look ahead as well as back to foresee problems as well as consider past problems. Although future problems, by definition, do not exist, they may, to the extent there is a rational basis to foresee them, be given equiva *563 lent or even greater weight than past experience in the formulation of a rule. The court is not the appropriate body to balance these matters; the choice is for DOE, provided it has a rational basis.
Finally, in the specific examples presented by petitioners, there is no showing that a parent or a child had made a request for authorization from appropriate school authorities to possess a cell phone for the problem discussed in the example, which request had been arbitrarily or capriciously denied. Thus, these examples have the further defect of not providing a basis for the review of the Rules because the administrative remedies (i.e., the possibility of authorization) had not been exhausted.
III. Constitutional Claims
Petitioners also make constitutional claims under both the New York and the United States Constitutions. Even if the Cell Phone Rules are sustainable under CPLR article 78 review, they must be set aside if they conflict with either the New York Constitution or Federal Constitution or both. Petitioners assert in their action for declaratory judgment that the Cell Phone Rules conflict with both. The gravamen of petitioners’ claims is that the Cell Phone Rules conflict with the constitutional rights of parents and children to be able to communicate with each other between home and school.
Nothing in the Cell Phone Rules forbids such communication, or the contents of any such communications. The only matter forbidden is the modality of the communication, i.e., whether the communication may be made through a cell phone which the student could carry into the school.
Neither the State Constitution nor the Federal Constitution include any express “constitutional right to bear cell phones.” As cell phones did not exist when such constitutions or the particular amendments cited by petitioners to be relevant became law, such constitutions do not grant an express authority to any such right. Petitioners, however, allege that certain general principles of constitutional law under both the State and Federal Constitutions require this court to set aside the Cell Phone Rules.
A. New York State Constitutional Claim
Petitioners’ argument under the State Constitution cites only Matter of Alfonso v Fernandez (195 AD2d 46 [2d Dept 1993]) for its support. Alfonso struck down a program of the New York *564 City school district to make condoms available to public high school students which program provided neither for parental consent nor for the right of parents to opt out of the program. The stated purpose of the program was to address health threats to students from AIDS.
The program arose out of a directive of the State Education Commissioner, issued in September 1987, to include in all elementary and secondary schools’ health curricula instruction concerning HIV and AIDS. Although the city school district apparently had adopted an educational program in compliance with the directive, the then New York City School Chancellor proposed and the then City School Board adopted an expanded program requiring each public high school to make condoms available on request to any student. No parental consent was required and no parental opt out was authorized, and each student to whom a condom was given was required to be counseled on its use and the consequences of the use and misuse of condoms.
The Second Department, in a 3 to 2 decision, struck down this program on two separate grounds: first that the program lacked common-law or statutory authority and second that the program “violate[d] the petitioners’ civil rights to rear their children as they [saw] fit.” (Id. at 60.) The violation by reason of the exclusion of a parental opt-out was said to occur “under the substantive Due Process Clauses of the Fourteenth Amendment of the United States Constitution and New York Constitution, article I, § 6.” (Id.)
The Second Department initially focused on the lack of parental consent to medical procedures and stressed that at common law, parents, in the absence of a statute to the contrary, generally possessed the rights to consent or withhold consent to medical treatment for their children. While the Second Department recognized that the courts or the Legislature could provide exceptions to this rule, it found neither the Commissioner of Education nor the City School Board competent to do so sua sponte as, inter alia, health matters were not within their central area of responsibility. Although this basis alone might have supported the result, the Second Department ventured further into the areas of substantive due process, and liberty interests, citing three United States Supreme Court cases in support of its position, i.e., Roe v Wade (410 US 113 *565 [1973]),[14] Meyer v Nebraska (262 US 390 [1923]) and Pierce v Society of Sisters (268 US 510 [1925]). No other New York court case was cited to establish the present existence of any doctrine of substantive due process under the New York Constitution.
There is nothing presently more controversial in the body politic of this country and state than attempts by competing advocates to enlist courts to address issues of sex, which they are unable to resolve through the usual political process. Cases other than Alfonso which have grasped this judicial “third rail” include Griswold v Connecticut (381 US 479 [1965] [contraceptives]), Roe v Wade (supra [abortion]), Lawrence v Texas (539 US 558 [2003] [sodomy]) and Hernandez v Robles (7 NY3d 338 [2006] [same-sex marriage]). The intense and sui generis nature of these controversies rarely commends the principles enunciated in such decisions as precedent to be expanded to unrelated matters.
Petitioners’ contention that Alfonso should be thus expanded to create an independent new constitutional right of communication modalities is rejected by this court. Alfonso addressed a conflict between an asserted educational policy imposed by rule without legislative sanction to promote student health, which was not a core and traditional concern for the schools, and which clearly conflicted with functions traditionally reserved to parents, i.e., addressing the sexuality of their maturing children. Unlike the case in Alfonso, the challenged Cell Phone Rules were clearly adopted as part of a comprehensive program which had been statutorily authorized to deal with the disruption of the learning process in schools, a matter central to their educational mission.[15]
The Court of Appeals has recently recognized, in Hernandez v Robles (supra at 366 [Graffeo, J., concurring]), that, except in the area of criminal procedure, where New York may accord an accused *566 greater rights under its own constitutional Due Process Clause, New York does not afford rights under its Due Process Clause greater than those accorded under the Due Process Clause of the Federal Constitution. Accordingly, as this court must follow Hernandez, it must look to federal constitutional law decisions to see whether Alfonso provides authority to support petitioners’ New York State constitutional claims.
Having taken such look, this court finds that the doctrine of substantive due process no longer exists as a principle of federal constitutional law. Thus, as such principle was the basis to support the alternate reason for the holding in Alfonso, such alternate cannot be New York law. Thus, Alfonso cannot support petitioners’ New York constitutional claims. Such claims may be supportable only to the extent claims under the United States Constitution are supportable. As this court has concluded as set forth in the next section, that petitioners have not established claims under the United States Constitution, this court must reject petitioners’ claims under the New York Constitution.
B. Federal Constitutional Claims
Petitioners also allege federal constitutional claims arising under the Fourteenth Amendment to the United States Constitution. Such claims, if valid, would require this court to find the Cell Phone Rules improper.
Here, the gravamen of petitioners’ arguments revolve around a claimed “interference with parental liberty interests.” Petitioners cite six cases to support their position, viz: Meyer v Nebraska (supra), Pierce v Society of Sisters (supra), Moore v East Cleveland (431 US 494 [1977]), Ingraham v Wright (430 US 651 [1977]), Troxel v Granville (530 US 57 [2000]) and Gruenke v Seip (225 F3d 290 [3d Cir 2000]). Each case discussed parental rights to rear their children in light of state actions allegedly in derogation of such rights. The two earlier cases, Meyer (1923), which struck down a Nebraska law making it a crime to teach any elementary school child in any language but English, and Pierce (1925), which struck down an Oregon law which forbade parents from sending a child to a nonpublic school, shed little, if any, light on the issues in this case.
While in Meyer, the Supreme Court referred to rights under the constitutional Due Process Clause which included a right “to marry, establish a home and bring up children” (262 US at 399), the Meyer court did not decide the case on such basis. In *567 Pierce, the Supreme Court followed the “doctrine” oí Meyer and found the Oregon law to unreasonably interfere “with the liberty of parents and guardians to direct the upbringing and education of children under their control.” (268 US at 534-535.)
In Meyer, the party seeking to void state law was a parochial school teacher and in Pierce, the plaintiffs were schools.[16] In neither case was a parent a party. Although the Court in both cases used language relating to the “liberty” of parents, the actual decisions in both cases turned on the business and commercial interests of the party seeking to void the state law (the teacher in Meyer and the schools in Pierce), to ply their trades without unreasonable state interference. Thus, although “parental liberty” was discussed, such issue was hardly central to the decisions which instead focused on the Fourteenth Amendment as a matter of “substantive due process” to enable the Court to void economic restrictions on business relationships.[17]
While later decisions cite Meyer and Pierce in support of parental liberties, neither Meyer nor Pierce discussed or considered the issue so as to define its ambit, other than to recite the existence of such concept in general.
Two of the cases cited by petitioners, Moore and Ingraham, were decided by the United States Supreme Court in the 1970s. Ingraham involved a federal constitutional challenge, under the Eighth and Fourteenth Amendments to the United States Constitution, to a Florida statute authorizing corporal punishment in public schools as a matter of school discipline. The 5 to 4 decision in Ingraham dismissed the challenge on both counts. Although the Court discussed “liberty interests” it acknowledged they “have not been defined precisely.” (Id. at 673.) Although the Court found that protected liberty interests were a matter that had to be preserved under the Fourteenth Amendment such protections did not extend to require the Court to void the Florida statute. “Parental” liberty issues were unmentioned in the case. The opinion also provided no explication of the term “protected liberty interest.”
*568 The Supreme Court in Moore set aside a conviction of Ms. Inez Moore, an East Cleveland, Ohio, homeowner, who was convicted of violating an East Cleveland municipal ordinance which forbade a dwelling in her area from being occupied by other than members of the same family. As the ordinance’s definition of “family” did not include the four blood relatives in her household, herself, her son, her son’s son and another grandson (a son of her other son who did not live with her), she was convicted and she appealed. Citing cases “tracing their lineage” to Meyer and Pierce, four justices found that the ordinance impinged on a “private realm of family life which the state cannot enter” (431 US at 499), and found the ordinance voidable on substantive due process grounds. The plurality opinion in Moore also cited Ingraham, but for the proposition that a substantive due process analysis was still proper in appropriate cases.
Moore was decided with a plurality opinion, two concurring opinions and three dissenting opinions.[18] Only four justices supported the theory of substantive due process and “liberty interests,” Justice Stevens, the fifth justice whose support was necessary for the result, concurred, but only on the grounds that the ordinance unreasonably impinged on Ms. Moore’s property rights as to the uses she could put her house under the zoning ordinance in question.
Accordingly, these two cases hardly represent a ringing endorsement of an expansive and expanding constitutional definition of “liberty interests” or a substantive due process analysis which petitioners assert to be relevant to this case.
The last two cases cited by petitioners, Troxel and Gruenke, were decided in this decade.
In Troxel, the Supreme Court affirmed a decision of the Washington Supreme Court voiding a Washington state statute which had permitted Washington courts to authorize visitation of a child by any person who could show that such visitation was in the best interests of a child. At issue was the grandparents’ request for visitation with their deceased son’s daughters over the daughters’ mother’s objection to such visitation. As in Moore, there were six opinions, one plurality, two concurring *569 and three dissenting.[19] While the language of the case mentions the fundamental constitutional rights of parents to make decisions as to how they raise their children, Troxel does not indicate that the possession of a cell phone by a child in school may fall into this category of a fundamental constitutional right.
The most recent case cited by petitioners in support of their federal constitutional claim is Gruenke, which was decided by the federal Third Circuit in August 2000, shortly after Troxel. Gruenke cited Troxel as authority (as well as Meyer and Pierce) that parental interests in “the care, custody and control of their children” is “perhaps the oldest of the fundamental liberty interests recognized by the [Supreme] Court.” (225 F3d at 304.) As Gruenke addressed the balance of such interests against the State’s power to supervise and control children in public schools, it is both the most recent and relevant authority cited by petitioners.
The case presents a somewhat convoluted factual and procedural story. The child in question, Leah, was a 17-year-old high school junior who was a member of her high school swimming team. In January, Seip, her varsity swimming coach, began to suspect (correctly, and for rational reasons) that Leah was pregnant. He asked his assistant coach to talk to Leah to discuss the possibility that she was pregnant. Leah denied that she was pregnant or that she had sex with her boyfriend. Seip then spoke to Leah and received the same denials; other members of the swim team, having sua sponte reached the same conclusions, also spoke to Leah and with the same denials. At Seip’s request, the school guidance counselor and the school nurse also talked to Leah and got the same denials. The mothers of other team members who also suspected the pregnancy also conveyed their suspicions to Seip. One mother suggested to Seip that Leah take a pregnancy test and another mother purchased a pregnancy test and gave it to Seip, who reimbursed such mother for its cost. In March, two other members of the swim team approached Leah and suggested that she take a pregnancy test. She refused. The next day the same two reapproached Leah and told her there was a test available. The facts as to exactly what happened next are unclear. However, eventually, after many discussions involving various people at the school *570 and the parents of other team members, but not Leah’s parents nor anyone at the school administration above the guidance counselor level, Leah took a pregnancy test and tested positive. After several additional conflicting pregnancy test results, Leah told her mother. By then she was six months pregnant.
Following Leah’s due date, her mother, on her own behalf and on Leah’s, sued Seip in federal District Court on various grounds, including a violation of the Gruenkes’ “substantive due process right to be free from state interference with family relations.” (Id. at 303.) This claim was dismissed by the District Court on two alternative grounds, i.e., first, was that Seip’s actions did not rise to the level of a constitutional violation, and second, even if it did, as such constitutional right was not clearly established, Seip could claim a qualified immunity. Two judges of the panel disagreed with the first conclusion of the District Court but agreed with the second and granted Seip immunity on the grounds that “[ajlthough the general principles were articulated by the Supreme Court opinions, their application to the unique circumstances of this case cannot be said to have been clearly established.” (Id. at 307.)
The third judge concurred with the result, but agreed, instead with the District Court that Seip’s actions did not rise to a constitutional violation.
Accordingly, although there has been some judicial discussion of a “fundamental parental right” or “parental liberty to rear children” in a federal constitutional context over an 80-year period, the above discussion of these cases shows that at best, as the Third Circuit majority in Gruenke notes, the parameters of “the general principles articulated by the Supreme Court” are hardly established. Reviewing the most recent three Supreme Court decisions, spanning almost 30 years, indicates that in only one, Troxel, was there a majority for any ratio decidendi to void a state law based on this supposed right or liberty, and virtually no discussion of the scope of the doctrine.
It is fairly clear that the concept of substantive due process no longer exists at the Supreme Court level, although Gruenke seems to resurrect some form of substantive due process as a ratio decidendi in the Third Circuit. The sole United States Supreme Court case to muddy this conclusion is Troxel.
The text of the plurality opinion in Troxel avoid the words “substantive due process,” but instead discusses “liberty interests,” and “the fundamental right of parents to make decisions concerning the care, custody, and control of their chil *571 dren” (530 US at 65-66) under the Fourteenth Amendment as the basis for decision. Meyer and Pierce are cited for the source of this concept. Mr. Justice Souter and Mr. Justice Thomas, in separate concurring opinions, recognized these rights, but seemed loath (in the case of Souter) or adamantly opposed (in the case of Thomas) to allow any implication that the decision had been made on a substantive due process basis.
Accordingly, no recent majority of the United States Supreme Court has recognized, in over a half century, “substantive due process” as a basis to review the action of a State or state agency. While the majority decision in Gruenke takes a different view, such Third Circuit decision does not bind this court, nor does this court, as an appropriate extension of Troxel, find that substantive due process still exists as a basis to decide a case. Accordingly, this court rejects petitioners’ assertion that the Cell Phone Rules may be reviewed and voided by the court under a federal substantive due process analysis.
Troxel does, however, support review of state or state agency action under the Fourteenth Amendment against the standard of whether such action violates “the fundamental right of parents to make decisions concerning the care, custody, and control of their children.” Petitioners’ claim that the Cell Phone Rules do violate this principle and must therefore be set aside by this court.
An initial question for this court, then, is what is the meaning and source of such principle, i.e., whether the scope of the principle is a discoverable factual concept, based on an original understanding as to what parental rights were at the time of the adoption of the Fourteenth Amendment, or whether the principle is a mutable one to be defined from time to time on the basis of the sensibilities of a majority of the Supreme Court, thus becoming in effect, a reprise of the doctrine of substantive due process, under a new name but reduced to a more circumscribed group of controversies. These “initial” alternatives hardly differ from the alternatives as to constitutional construction which are the subject of an ongoing general philosophical debate in the Supreme Court and among commentators and scholars.
This court concludes that whichever view is taken on the source and definition of the limitation on state action by reason of such action being deemed to have violated the “fundamental right of parents to make decisions concerning the care, custody, and control of their children,” in violation of the Fourteenth *572 Amendment, such principle provides no basis for this court to set aside the Cell Phone Rules.
To the extent the concept turns on an “original understanding,” this court notes that neither in 1791, when the Constitution was amended to add the Fifth Amendment, which introduced the language of due process of law, or in 1868 when the Fourteenth Amendment was adopted, adopting identical language to the Fifth Amendment, were there cell phones, or for that matter telephones of any kind. Thus, neither amendment could have contemplated that the ability to possess cell phones was necessarily relevant to constitutional principles. To the extent that “fundamental” rights are mutable, the recentness of the emergence of the cell phones as a common part of life leaves this court doubtful that the United States Supreme Court would presently conclude that cell phones are now “fundamental” instrumentalities to the exercise of fundamental rights or that banning cell phones from school premises so “fundamentally” prevents communications between parent and child that the Cell Phone Rules are to be set aside on this theory.
The recent 6 to 0 decision of the Court of Appeals in Matter of E.S. v P.D. (8 NY3d 150 [2007]), which reviewed Troxel and found Troxel not to void New York’s grandparent visitation statute, Domestic Relations Law § 72 (1), also supports this result. Domestic Relations Law § 72 (1) authorized the court to grant visitation to a grandparent where one or both parents were deceased or under extraordinary circumstances, which were further defined in the statute, unlike under the Washington statute voided in Troxel where visitation could be applied for by anyone, with the sole criterion being the “interests of the child.” While the Court of Appeals noted that Domestic Relations Law § 72 (1) was in derogation of “the common-law rule that ‘grandparents [have] no standing to assert rights of visitation against a custodial parent’ ” (8 NY3d at 156), the Court of Appeals found, after expressly considering Troxel, that Domestic Relations Law § 72 (1) had sufficiently circumscribed such change so as not to be voidable under Troxel.
A reading of E.S. leads to two conclusions, viz., first, a state is not per se precluded from changing traditional relations between parents and children, even those clearly or expressly recognized under common law, no matter for how long, and second, a state statute permitting state action as intrusive as granting a grandparent visitation to a child, against the express *573 wishes of a parent is, if appropriately designed and limited to provide a fair process for determination, would not be enough to invoke the Fourteenth Amendment.
Comparing the enormity of the state intrusion into the parent/ child relationship in Troxel[20] with the level of alleged interference here indicates that this court would be off on a frolic of its own to extend the liberty/right of parents’ argument to the Cell Phone Rules as a federal constitutional matter. That digression toward judicial activism, this court will not take.
Accordingly, this court finds that whatever constitutional rights a parent may have under Supreme Court precedent to void a state law or regulation for having interfered with the parents’ fundamental rights to make decisions concerning the care, custody and control of their children, such rights do not apply to the controversy here.
Accordingly, this court need not address subsidiary issues of the level of scrutiny, burden of proof or standard of analysis which would be otherwise required to be addressed in considering petitioners’ federal constitutional claim.
IV Conclusion
This court concludes that petitioners may not prevail on their attack on the Cell Phone Rules either under CPLR article 78 or under their action for declaratory judgment. By so ruling, this court does not rule on the wisdom or lack of wisdom of the Cell Phone Rules, or whether there may be now or in the future any better way to balance the desires of some parents and the need for practical ways to maintain discipline in the schools, or whether the ever-changing technology of cell phones or other equivalent devices may enable the respondents (who are in no way constrained from modifying or repealing the Cell Phone Rules) to craft a different approach to maintain in-school discipline.
Although the petitioners have urged that there may be technological “fixes” to allow the schools to meet their goals of reasonable discipline in a manner consistent with petitioners’ views and desires, as discussed above, none of such suggestions are so compelling as to form a basis to find the Cell Phone Rules faulty as a matter of law or to suggest to this court that it should intrude itself into the delicate balancing *574 process of establishing rules of conduct in the New York City public schools. As one cannot predict the future, except only to recognize that there will continue to be rapid and significant changes in technology, it is clearly possible that, in the future, inexpensive, effective, appropriate and available devices and systems may change the situation. However, this court also recognizes that, because the pace of change of technology is so rapid, courts should also avoid, wherever possible, deciding issues on the basis of the current technology. Court decisions take several years from the commencement of a suit to the final appeal. Technology moves faster. Even where a court had the perspicacity to understand all relevant technical issues properly, its ruling would probably be obsolete long before the last appeal. While courts in some instances must make such decisions, they are better left to administrators who at least have the potential capacity to institute new rules to meet changing technologies.
This court finds that judgment should be entered for respondents in petitioners’ action for declaratory judgment and that petitioners’ petition under CPLR article 78 is hereby dismissed.

. Education Law § 2801 requires each local board of education in the state to adopt a code of conduct for the maintenance and enforcement of order on school property. It was on the authority of this section that the Chancellor (who for this purpose is the Board of Education of the City of New York) issued the Standards.

. “Engaging in a pattern persistent Level 1 behavior” of any kind would also constitute a level 2 infraction. (See Standards Prohibitions A21, B19.)

. The doctrine of separation of powers provides an implicit limitation on the courts, preventing the review of certain actions of the Legislature or Governor. Such doctrine is inapplicable here.

. See CPLR 1007 (third-party practice), CPLR 1011 (successive third-party proceedings), CPLR 1012 (intervention as of right) and CPLR 1013 (intervention by permission).

. CPLR 7803 sets forth the “only questions that may be raised in a proceeding under” CPLR article 78.

. Thus, the “capricious” test of CPLR 7803 becomes one of whether there was a rational basis for the rule. If not, the rule would indeed be capricious.

. Stewart Wolpin, Hold the Phone, 22 Am Heritage of Invention & Tech (No. 3) 21 (2007).

. Id. at 31.

. Some sparsely populated rural areas do not have cell phone service.

. The criminal law, for example, recognizes that children under specified ages are less responsible for their criminal acts than adults by treating them as “juveniles” or “youthful offenders.”

. A reading of the Standards illustrates the type of potential behavioral problems faced by schools within the city school district.

. During the pendency of this matter the court discussed with the parties potential costs to the schools of maintaining cell phone lockers. The petitioners expressed willingness to consider a resolution of the dispute where DOE might contract for private vendors to establish pay lockers for cell phones in schools. After a short period, DOE declined to pursue this possibility. In considering the legal obstacles to such a program, this court does not fault DOE from declining. However, there seems to be no impediment for an entrepreneur unaffiliated with a school from setting up such a pay locker depository for cell phones as a commercial venture, near a school building. Without the need to endure public bidding of contracts and entanglement with public bureaucracies, an entrepreneur should be able to provide such service at a far lower economic cost than a public school. This court will not speculate whether the fact that no entrepreneur has so acted is market evidence of the validity of DOE’s position that depositories may be uneconomic, or evidence that entrepreneurs, being aware of the fact of this litigation, are waiting to see if the cell phone ban will remain so as to assure that a capital investment in lockers will have a long run chance of producing a fair return.

. The Cell Phone Rules deal with “Bringing [a cell phone] to school,” and do not seem to cover the possession of cell phones at events not at a school.

. Roe v Wade was decided by a 7 to 2 vote solely on the constitutional right to privacy. Although seven justices joined in the Court’s opinion, two of such seven, Justices Douglas and Stewart, also issued concurring opinions which also cited a “liberty” interest.

. Although perhaps not relevant to the legal issues decided in Alfonso, this court notes that the Chancellor’s position on the condom controversy was thought to have been a principal cause of his ouster. After the Alfonso decision, the Commissioner of Education modified the state education regulations to authorize school districts to adopt a condom distribution program but only after such program was approved by an advisory council representing interests outside of the school administration, and only where such program authorized parents to opt their children out of the program.

. While the Society of Sisters was a nonprofit Catholic parochial school, the other respondent in Pierce was a proprietary military school and the court made no distinction between the respondents in the opinion or result.

. See White, J., dissenting in Moore v East Cleveland (supra), for a discussion of both Meyer and Pierce being based on the substantive due process theory, which theory had been effectively repudiated by Ferguson v Skrupa (372 US 726 [1963]).

. In his dissent, Justice White noted that both Meyer and Pierce were in fact decided on a substantive due process theory and that such theory had been repudiated by Ferguson v Skrupa (372 US 726 [1963]).

. Only two justices, Rehnquist and Stevens, participated in both Moore and Troxel, as they were decided 27 years apart (Stevens concurred in Moore, but on grounds unrelated to liberty interests and substantive due process, and dissented in Troxel; Rehnquist dissented in Moore, but concurred in Troxel).

. Which is about as “fundamental” as it gets in the context of the right of a parent to raise a child.